745 A.2d 471

**Rufus Oliver BRABOY, Jr.**

v.

**STATE of Maryland.**

No. 720, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Feb. 4, 2000.

Joanna Weiss, Student Atty. (Jennifer Lyman, Assigned Public Defender, on the brief), Washington, DC, for appellant.

Kathryn Graeff (J. Joseph Curran, Jr., Atty. Gen., Shannon E. Avery, Baltimore, and David Ruark, State's Atty. for Wicomico County of Salisbury, on the brief), for appellee.

Argued before MURPHY, C.J., EYLER, J., and PAUL E. ALPERT, J. (Ret., specially assigned).

PAUL E. ALPERT, Judge (Ret., specially assigned).

Appellant Rufus Oliver Braboy was convicted by a jury in the Circuit Court for Wicomico County (the Honorable J.

Davis presiding) of assault and carrying a deadly weapon and presents the following questions for our review, rephrased as follows:

I. Did the circuit court err in refusing to give appellant's requested jury instruction on the defense of habitation and instead giving a general self-defense instruction?

II. Did the circuit court err in denying appellant's motion to suppress his statements to the police because he had supposedly invoked his rights to silence and counsel?

III. Did the circuit court abuse its discretion in admitting the inflammatory testimony of the victim's mother regarding the condition of her son as exceeding the rule against lay opinion?

We affirm the circuit court and explain.

## Background

On the evening of May 17, 1998, appellant was at his residence in Salisbury, Maryland entertaining guests Ms. Cannon, Mr. Gregory ("Gregory"), and Sissy [1]. The group played cards, drank alcohol, and used illegal narcotics.

At some point in the evening, appellant and Gregory left the apartment and went to Ms. Cannon's house.[2] Appellant asserts that he waited outside the house while Gregory went inside. Hearing what sounded like the loading of a gun, appellant became suspicious and recalled an earlier conversation he overheard between Gregory and Ms. Cannon about committing a robbery.[3] Gregory emerged from Ms. Cannon's

---

**1.** Mr. Gregory, an acquaintance of appellant, was the victim in the incident. Sissy, Ms. Tamara Thompson, was the girlfriend of appellant's friend. Ms. Cannon arrived with the victim.

**2.** The reason that the two men left the apartment was in dispute. Appellant contended that he went with Gregory to Ms. Cannon's because Gregory asked appellant to go with him to "get something" at Ms. Cannon's. On the other hand, Ms. Cannon stated that the men left to retrieve a gun because of an attempted robbery on appellant the night before.

**3.** At trial, Ms. Cannon vehemently denied that such a conversation ever took place.

in a change of clothes, consisting of a dark sweat suit and a black hood covering his head, and suggested to appellant that they proceed back to appellant's house through a dark alley instead of a well lit street. Appellant refused, and the two agreed to meet back at appellant's house.

On his way home, appellant was confronted by Gregory on the street soon after the two split up. Gregory allegedly pointed a handgun at appellant's head, causing appellant to "smack" the gun out of his face, hit Gregory, and run away. Appellant then called his friend, Mr. Lofland, and told him about the attempted robbery. The two spoke for several minutes about the incident. Appellant then decided to return home, remembering that Sissy was still at his apartment.[4] He ran into Sissy's boyfriend, Mr. Daniels, on the way home, who agreed to accompany him back to his apartment. When the men reached his apartment, appellant put down the brick he had picked up for his protection and rang the apartment to be let in.[5]

Appellant was met at the door by Gregory and immediately hit Gregory to prevent him from pulling the gun on him again. A fight then broke out between the two men covering the entire space of appellant's apartment. Appellant hit Gregory with a "T" shaped metal tool, dazing him, backing away, then yelling at Gregory to leave his apartment.[6] Gregory struggled to get up and then fell onto the second floor landing. He then unsuccessfully grabbed onto the railing that was about two feet off the ground to pull himself up, slipped and fell forward onto the ground below.

_____

**4.** Appellant picked a brick up off the street and carried it back to his house with him for protection in case he ran into Gregory or Ms. Cannon.

**5.** Because appellant had left the house without his keys when he went with Gregory, he rang his bell to have Sissy let him in.

**6.** Appellant claims he hit Gregory with the tool because he outweighed him by forty pounds. Ms. Cannon claims that appellant also hit Gregory with the butt of the gun. The minor details surrounding the fight are irrelevant to this appeal.

Gregory was seriously injured in the fight and was still hospitalized and unable to testify at the time of trial. The night following the incident, with a warrant out for his arrest, appellant turned himself in to the Salisbury Police Department.

While at the police department, appellant spoke with Officer Kolb and gave incriminating statements, admitting to the fight but claiming that he was attempting to prevent a robbery in his home.[7] Appellant was charged with (1) two counts of assault in the first degree; (2) two counts of assault in the second degree; (3) unlawful use and carrying of a handgun; (4) wearing and carrying a deadly weapon; and (5) conspiracy to commit assault.

After appellant's motions to suppress were denied, a jury trial was held in the Circuit Court for Wicomico County, and appellant was found guilty of one count of both first and second degree assault and carrying a deadly weapon. He was sentenced to 25 years for the assault and a consecutive 3–year sentence for the carrying of a deadly weapon. This appeal followed.

## Discussion

### I. Jury Instruction on Defense of Habitation

#### A. Preservation for Appeal

Appellant contends that the circuit court erred in giving a self-defense jury instruction and rejecting his request for an instruction on the defense of habitation.[8] Without reaching the substantive merits of the appeal, we address appellee's

---

7. The specific details regarding the conversation are discussed later in this appeal.

8. The details concerning the differences between the two instructions and the trial judge's application and decision that the self-defense instruction encompassed the habitation defense are discussed in part I.B of this opinion.

contention that appellant did not properly preserve this issue for appeal.

Maryland Rule 4–325(e) provides in pertinent part:

No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.

Appellant's counsel requested a jury instruction on the defense of habitation,[9] which was summarily denied by the court as adequately covered by the self-defense instruction. The court then asked if there was anything further before the instructions would be given, and appellant's counsel replied in the negative. The court then read the jury its instructions, using the instruction of self-defense and not the defense of habitation. At the conclusion of the instructions, appellant's counsel stated that *"the defense has no exceptions, Your Honor"* whereupon counsel for both sides presented closing argument.

We find *Johnson v. State,* 310 Md. 681, 531 A.2d 675 (1987), analogous to the case at bar, and hold that the issue was not preserved for appeal. In *Johnson,* defense counsel requested a specific jury instruction at the close of the evidence but before the instructions were given to the jury. The court denied the request, and "nothing more was said on the subject, and the trial court thereafter instructed the jury." 310 Md. at 685, 531 A.2d 675. After the instructions were given, counsel approached the bench, at which time the court asked counsel if they had any objections, to which defense counsel replied "No exceptions." *Id.*

---

**9.** The habitation defense applies when a defendant has used deadly force in response to a reasonable belief that the victim intended to commit a felony in the home or to inflict serious bodily harm or death on the inhabitants of the home. This defense is essentially a corollary to the "castle doctrine," which allows a person to use deadly force without the need to retreat, in order to protect the person's home. See *Crawford v. State,* 231 Md. 354, 360, 361–2, 190 A.2d 538 (1963).

The Court of Appeals held that the issue was not preserved because

> the language of the rule [Md. Rule 4–325(e) ] plainly requires an objection *after the instructions are given,* even though a prior request for an instruction was made and refused.

*Id.* at 686, 531 A.2d 675. Policy rationales exist behind the strict application of this rule:

> There are good reasons for requiring an objection at the conclusion of the instructions even though the party had previously made a request. If the omission is brought to the trial court's attention by an objection, the court is given an opportunity to amend or correct its charge. Moreover, a party initially requesting a particular instruction may be entirely satisfied with the instructions as actually given.

*Id.* See also *Bennett v. State,* 230 Md. 562, 188 A.2d 142 (1963).

■ Even if the rule is not completely complied with, "we have recognized that, on occasion, an objection in substantial compliance with the Rule will be considered adequately preserved." *Bowman v. State,* 337 Md. 65, 69, 650 A.2d 954 (1994). Certain conditions must be met for substantial compliance to exist, namely:

> There must be an objection to the instruction; the objection must appear on the record; the objection must be accompanied by a definite statement of the ground for objection unless the ground for objection is apparent from the record and the circumstances must be such that a renewal of the objection after the court instructs the jury would be futile or useless.

*Id.* (citing *Gore v. State,* 309 Md. 203, 209, 522 A.2d 1338 (1987)). We find nothing in the record to indicate that appellant's counsel did anything other than request the instruction prior to the court's instructing the jury. Once the request was denied and the instructions given, there was no further discussion. As such, we conclude that the issue was not preserved for appeal.

■ Appellant also asserts that even if the issue was not preserved for appeal, we should review it, pursuant to Maryland Rule 4–325(e), providing in pertinent part that

an appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

This provision, however, is only applicable where the circumstances are "compelling, extraordinary, exceptional, or fundamental to assure the defendant a fair trial." *Conyers v. State,* 354 Md. 132, 171, 729 A.2d 910 (1999) (citing *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035 (1980)). Those circumstances do not exist in the case sub judice.

### B. Adequacy of Self–Defense Instruction Given

■ Even though the issue was not properly preserved for appeal, we agree with the circuit court that the instruction given amply covered the habitation defense instruction.

Appellant requested the following habitation defense instruction:

You have heard evidence that the defendant acted in defense of [his][her] home. Defense of one's home is a defense and you are required to find the defendant not guilty if all of the following three factors are present:

(1) the defendant *actually believed* that victim was committing [was just about to commit] the crime of (crime) in [at] the defendant's home;

(2) the defendant's *belief was reasonable;* and

(3) the defendant used *no more force than was reasonably necessary* to defendant against the conduct of victim.

In order to convict the defendant, the state must show that the defense of one's home does not apply in this case by proving, beyond a reasonable doubt, that at least one of the three factors previously stated was absent [emphasis added].

Instead, the trial judge used this instruction:

Self-defense is a defense and you are required to find the Defendant not guilty if all of the following three factors are present; one, the Defendant *actually believed* that he was in immediate and imminent danger of bodily harm; two, the Defendant's *belief was reasonable;* and three, the Defendant used *no more force than was reasonably necessary* to defend himself in light of the threatened or actual harm. Deadly force is that amount of force reasonably calculated to cause death or serious bodily harm. If you find that the Defendant used deadly force, you must decide whether the use of deadly force was reasonable. Deadly force is reasonable if the Defendant actually had a reasonable belief that the aggressor's force was or would be deadly and that the Defendant needed a deadly force response.

In addition, before using deadly force, the Defendant is required to make all reasonable efforts to retreat. The Defendant *does not have to retreat if the Defendant was in his home*, retreat was unsafe, the avenue of retreat was unknown to the Defendant, the *Defendant was being robbed* [emphasis added]. . . .

The court denied appellant's request for the habitation defense instruction because it was "adequately covered" in the instruction given:

THE COURT: One of your arguments to the jury will be that he was acting in defense of his home, is that correct?

[COUNSEL FOR APPELLANT]: That's a planned argument, Your Honor. It was inside his house, I think there was evidence generated of that. . . .

THE COURT: Okay. Well, reading the rule and the annotations with the pattern rule, it seems to me that giving the instruction, the complete instruction for self-defense . . . adequately covers the point. So I'll deny your request for the defense of habitation instruction.

We agree with the circuit court that the instruction given as a whole was "adequate to cover" the situation here. Both instructions discuss (1) defendant's actual belief of danger of death or bodily harm; (2) that the belief was reasonable; and

(3) that no more force was used than reasonably necessary. Furthermore, the self-defense instruction also discussed the duty to retreat and the fact that the defendant does not have the duty to retreat (1) when he is in his home; or (2) being robbed. All of the major requirements in the habitation defense instruction were included in the instruction given.

Because we hold that the jury instruction request was not preserved for appeal, and despite that, was adequately covered in the instruction given, we do not address the substantive issues behind the defense of habitation.[10]

## II. Suppression of Statements Made to Police

Appellant also contends that the trial court erred in denying his motion to suppress the incriminating statements he made to police in alleged violation of his rights to counsel and silence.[11] The trial court's fact finding will be upheld

---

10. There was some dispute between the parties over whether the defense of habitation applied because appellant was not in his dwelling and Gregory was already in his home; thus he was not preventing Gregory's entry into his home. While not relevant to this appeal, we note the compelling comments of 40 Am.Jur.2d Homicide § 168, suggesting that the definition of "dwelling" may very well include areas outside of the house itself:

 While the courts are agreed upon the general rule that one attacked at or in his own dwelling is not required to retreat, there is some difference of opinion regarding the extent of the premises where one may thus defend himself without retreat. That the rule is not limited to the dwelling house, strictly speaking, seems to be generally conceded, and there is general agreement that no duty to retreat rests upon one who, without fault, is attacked by another when in his own curtilage. The curtilage embraces such space as is occupied customarily by the dwelling house and outbuildings, including the yard around the dwelling house, the garden, and a porch attached to the dwelling. It does not, however, include the street or road adjacent to the premises of the slayer, common areas of an apartment building, an open driveway, or a parking lot.

 See also Annotation, *Homicide: Extent of premises which may be defended without retreat under right of self-defense*, 52 A.L.R.2d 1458 (1957).

11. Appellant claims the violation was pursuant to his 5th, 6th, and 14th amendment rights under the United States Constitution and Maryland Declaration of Rights.

unless it was "clearly erroneous"; however, as the appellate court we must make an independent constitutional determination on the confession's admissibility. *Williams v. State*, 127 Md.App. 208, 212–13, 732 A.2d 376 (1999). See also *Riddick v. State*, 319 Md. 180, 571 A.2d 1239 (1990).

Prior to the interview with appellant, Officer Kolb explained appellant's rights to him. Appellant's responses to these advisements are what appellant relies on in maintaining that his constitutional rights were violated. The portions of the conversation relevant to the right to remain silent are as follows:

Q. I want to make you know what your rights are, okay, Rufus, we're going to go over these, says you have, you have the absolute right to remain silent, do you understand that?

A. Yes, I understand.

Q. Okay, anything you say or write may be used against you in a court of law, do you understand that?

A. Mmmm, what do you mean, can I ask you a question?

Q. Okay, well I can't discuss anything with you until I make sure you understand your rights. Okay, it might clear some things up as we go. Anything you say or write may be used against you in a court of law, do you understand that?

A. Uh,huh. . . . . I mean, if I don't say anything, I, I'm, either way I'm going to be locked up, either way, no matter what happens, I'm going to be locked up, whether I say nothing or whether, it still doesn't matter, I'm going to jail, that's it.

Q. Okay, but, but if you have some questions I'll be willing to talk to you, but what we just need you, I just want to make sure that I'm not violating your rights and if you want . . .

A. I'm going to get locked up, right, if I tell you what happened and why things happened the way they happened, I'm still going to get locked up, I don't want to say anything. . . .

Q. Okay, you're telling me that uh, you shouldn't be locked up and, and I don't know if you have any questions or not, but in order for me to discuss the case, that you have to understand what your rights are and you just have to agree to talk with me, you know with or without an attorney.

A. I want to talk with you, but I don't want to set myself up for anything . . .

 We believe that the trial judge was not clearly erroneous in denying the motion to dismiss on the right to silence issue when he concluded:

I don't think a Defendant can or should be expected to assert the privilege in the same manner that an attorney would assert it. And I don't think that the law expects or anticipates that a citizen would stand fast to his constitutional rights in the face of pressure being put on him by the police. But I do think there's some expectation if you're going to assert your right, assert it. If you assert your right and say I want to remain silent and then keep dragging the conversation back to things that are beyond the procedural advice of rights. . . . He may have asserted his right [to silence] but he reinitiates the conversation. And my reading of it is that's essentially what he did, he reinitiated the conversation to substantive matters, thereby waiving his right to remain silent as to them. Motion denied.

Appellant did indeed say that he "did not want to say anything." This assertion, however, was followed with several questions about the reason for his arrest, and his repeated desire to talk to the officer and explain why he "shouldn't be locked up." As such, if appellant did invoke the right to silence, he reinitiated the conversation with these subsequent inquiries, thus waiving the right to remain silent.

Appellant also contends that he asserted his right to counsel, which was subsequently infringed upon by the officer when he continued to speak to appellant. The transcript of the conversation provides in pertinent part:

Q. If you want a lawyer and you cannot afford to hire one, you will not be asked any questions and the court will request to appoint a lawyer for you. Do you understand that? (Pause) Do you want me to read that again to you?

A. *No, cause I want a lawyer <u>but</u> I can't afford a lawyer.*

Q. *Okay, if you want.*

A. *I want to tell you, I, I got, you need to know.*

Q. Okay. What this is stating is that if you want a lawyer, and you can't afford to hire one, uhm, you will not be asked any questions and the court will be requested to appoint a lawyer for you. It means that if you want to talk to me today, I'll be more than willing to talk to talk you, and but if you want a lawyer, you don't have to talk to me.

A. Yeah, because I said, you know, I shouldn't be, I should be here locked up.

Q. Okay . . . . do you understand that other Right 4?

A. Yes. . . .

Q. This one says I have, I have read this statement of my rights and I understand what my rights are, and I'm willing to make a statement and answer questions, I do not want a lawyer at this time, I understand and know what I am doing. No promises or threats have been made to me, no pressure or coercion of any kind have been used against me, I haven't promised you anything. I haven't threatened you in any way to make you talk to me, have I?

A. No, you haven't promised me anything.

Q. Okay, have I threatened you?

A. No, you haven't threatened me.[12]

(Emphasis added.)

After further discussion on the issue, appellant signed the waiver, initialing that each right was explained to him and that he was willing to make a statement and answer questions.

---

**12.** The conversation that followed is set out on pages 231 – 32 *infra.*

Appellant was then interrogated and made incriminating statements.[13]

The trial court denied the motion to suppress the statements because appellant's fifth amendment right to counsel was not violated:

> And there says the Defendant, who could have been interrupted . . . as asserting his right to cut off the conversation, being reminded again if you tell me you want a lawyer, I can't talk to you. It doesn't say or even suggest that he wants to assert that right.

Appellant contends that he invoked the right to counsel when he first stated that he "wanted a lawyer, *but* couldn't afford one." We believe that the trial court correctly denied the motion to suppress the statements. His rationale behind denial of the motion was not clearly erroneous. A suspect must request counsel unambiguously to assert validly the right to counsel. *See Davis v. U.S.*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). When the accused makes a statement to police referring to counsel

> that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents [Supreme Court precedent] do not require the cessation of questioning. . . .

*Id.*

Courts have refused to strictly apply this rule; rather, when an accused makes a statement that may have invoked the right to counsel, an objective inquiry is conducted. *Id. See also Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The inquiry involves an examination of the "totality of the circumstances surrounding the interrogation." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). In reviewing the entire conversation that took place between the police officer and the accused, we are not convinced that appellant unequivocally and "unambiguous-

---

**13.** The specific contents of that statement are irrelevant to this appeal.

ly" requested counsel. The officer continually stated that he was simply explaining appellant's rights to him and that, if he wanted a lawyer, he could not talk to him further. Appellant repeatedly said he understood this, wanted to talk because he should not be locked up, and eventually knowingly and voluntarily signed the waiver.

### III. Lay Opinion of Victim's Mother

 Appellant further contends that the trial court abused its discretion in allowing the victim's mother to testify regarding her observations of her son's medical condition.

At trial, the State called Emily Gregory, the victim's mother, to the stand. Because she was not an expert witness, the court limited her testimony to her observations. Her testimony proceeded in pertinent part as follows:

Q. When you visit your son, does he respond to you?

A. No.

Q. Can he speak?

A. No.

Q. Does he have any movement?

A. No.

Q. Has he been like that since May 17th?

At this point, appellant's counsel objected to the testimony because it was prejudicial to appellant's case and was presented only as sympathy testimony. The court overruled the objection, stating that "it is an admissible way and reasonably calculated to reflect on the extent of harm [which] is one indicia of the intention with which the degree of force was used. So I think it is admissible for that reason."

The direct testimony of Ms. Gregory concluded as follows:

Q. Since May 17th have you observed any change in your son's condition?

A. The only change is now he does open his eyes but he doesn't really see anything. He can't follow anything like light or nothing at all. He just has them open, they aren't

focused on anything. And he's paralyzed. He has a trach in his throat.

Q. How is he fed?

A. He's fed through a tube in his stomach.

Q. Has he ever spoken to you since May 17th?

A. No, sir.

Appellant asserts on appeal that this was incorrect lay opinion testimony and inadmissible because it was highly prejudicial to appellant's case.[14] We disagree.

Maryland Rule 5–701 provides in pertinent part:

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

A relevant issue in the case was the medical condition of appellant and the degree of force used by appellant. While other forms of medical evidence were available to the State, the court did not abuse its discretion in allowing Ms. Gregory to testify to the personal observations she has made while visiting her son in the hospital.

**JUDGEMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

**14.** For the purpose of discussion, we will assume that her testimony was a lay opinion and not a statement of fact.