2002 WY 41

**John C. HADDEN, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 00–336.

Supreme Court of Wyoming.

March 15, 2002.

Ken Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; Diane Courselle, Defender Aid Program; Elana Sears, Megan Overman, and James M. Meseck, Student Interns. Argument by Ms. Overman and Mr. Meseck, Representing Appellant.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling and Robin Sessions Cooley, Senior Assistant Attorneys General. Argument by Ms. Cooley, Representing Appellee.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

HILL, Justice.

[¶ 1] Appellant, John Hadden (Hadden), was convicted of first-degree sexual assault and sentenced to a term of 15 to 20 years in the Wyoming State Penitentiary. He appeals that finding of guilt, claiming that the district court erred in denying a motion to suppress statements he made to police after he requested the assistance of an attorney, that there is not sufficient evidence to sustain his conviction, and that the trial court erred in instructing the jury on the subjects of "discrepancies in testimony" and "flight after committing a crime."

[¶ 2]  We will affirm.  However, we will also hold that after the publication of this opinion in the advance sheets of Pacific Reporter Third, the giving of a flight instruction in a criminal case will constitute reversible error, though the prosecution may still prove up and argue flight as a circumstance from which guilt may be inferred.

## ISSUES

[¶ 3]  Hadden raises these issues:

I.  Whether it was error for the trial court to not suppress Mr. Hadden's custodial statement to Detective Reekers when Mr. Hadden requested the assistance of counsel?

II.  Was there sufficient evidence to support the conviction of first degree sexual assault when the victim testified that Mr. Hadden did not resemble her attacker?

III.  Whether the trial court erred when instructing the jury on witness credibility and flight when the instructions unduly focused the jury's attention on isolated facts?

The State rephrases those same issues in very similar terms.

## FACTS

[¶ 4]  At about 2:30 a.m., on August 6, 1999, the victim of the instant crime burst into a convenience store located near the Outlaw Inn in Rock Springs. The attendant at the convenience store recognized the victim as someone she had seen before and observed that she was "highly aggravated,[1] upset, distraught," that she "was bloody and her eye was was almost closed shut from swelling and her nose was bleeding," and that she reported that she had been beaten

---

1.  The witness may have intended the word to be "agitated," though the victim also expressed some "aggravation" to the witness, as the victim had knocked several times on the side door of the convenience store and her knocks went unanswered (the attendant testified that she heard the knocking but could not see anyone there).

and raped. The victim was taken to the hospital in Rock Springs. There, she was able to describe some of the events that had occurred that night, including that she met a man at a bar in Rock Springs and had permitted him to drive her car to a location near the Outlaw Inn so that he could return to his semi-truck, as well as for what may have been intended to be a sexual liaison. That man was later ascertained to be John Hadden. When they arrived at the Outlaw Inn, Hadden attacked the victim and viciously beat and raped her. Hadden then ran off into the night, leaving the victim prostrate, only partially clad, and severely bloodied in the back seat of her car. Hadden had apparently also taken the keys to her car, or at least she did not have them when the attack was over. The keys to the victim's car were never found.

[¶ 5] The victim was able to make it to the convenience store and report the crime very shortly after it occurred. She gave a description of the person who had beaten and raped her, but that description did not meaningfully resemble Hadden. The victim was unable to identify Hadden in a photo lineup, and she tentatively identified a man in a photo lineup who was not Hadden.

[¶ 6] A key piece of evidence was a baseball cap, which the person who raped the victim had left in her car. At trial, the victim could not say that Hadden was the man who had beaten and raped her, though likewise she did not testify that he was not that man. She was certain that the man who raped her was the man with whom she left the bar and that was the man who left a baseball cap in her car.

[¶ 7] At the hospital in Rock Springs the victim was examined and her injuries catalogued. Her face was badly beaten and she suffered other bruises. Her blood alcohol concentration was .256, and she appeared to observers to be very intoxicated. Her genital area was not injured and the emergency room physician conducting the examination, who had handled four to five hundred such examinations in his career, testified that the lack of genital injuries is very common, as most rapists are intent on gaining access to the woman's genitals, not injuring them. No sperm was found in her vagina or rectum, and the emergency room physician testified that that also was not uncommon. Based upon his experience, the physician viewed the victim's condition as constituting an extreme degree of physical injury and did not find it surprising that the victim's memory of the evening's events was impaired, given her injuries and the level of her intoxication.

[¶ 8] The investigation immediately following this incident produced very little in the way of leads, with the exception of a black or dark navy blue baseball cap embossed with "Imperial Group Inc.," the name of a trucking company, and that company's logo. The victim identified the hat as like the one worn by the man who attacked her. That information eventually led to a trucking company in Florida, but because the records of that company indicated no trucks in Wyoming on the relevant date, that lead came to an end.

[¶ 9] A break in the investigation developed when, on March 16, 2000, an agent for the Florida Department of Law Enforcement received information that Amy Hadden, John Hadden's then estranged wife, had reported to local police the commission of a possible crime of rape that her husband had committed in Rock Springs, in August of 1999. That report led law enforcement officers to Christopher Hobbs, who was the original source of Amy Hadden's information. At this point in time, the Haddens were involved in getting a divorce and determining who would have custody of their six-year-old daughter.

[¶ 10] Florida police interviewed Hobbs, and he related that Hadden had confessed to him that he had raped and beaten a woman in Rock Springs, on August 6, 1999. Hobbs also testified at Hadden's trial. He related that when he was sixteen, he moved in with the Haddens because he had no other real home to which he could go.

[¶ 11] Hobbs occasionally traveled with Hadden when he went on over-the-road trips, and one of those trips took them through Wyoming, where they stopped on August 5, 1999, for a planned overnight stay in Rock Springs. While in Rock Springs, Hadden,

Hobbs, and another truck driver attended a carnival, drank liquor, met some girls, and decided to go to a bar. During these activities, Hadden was driving his truck. Eventually, they did park that truck behind a bar, which was apparently the "Saddle Lite Bar," where Hadden met up with the victim. Hadden said he was going into the bar and told Hobbs to stay in the truck and sleep, which he did. Three or four hours later, Hadden returned to the truck (which would have been between 2:00 a.m. and 3:00 a.m.), awoke Hobbs, and told him to get down from the sleeper compartment and into the passenger seat and act as a lookout. Hobbs noticed that Hadden was covered in blood and was "very nervous, very scared, in a hurry and anxious to leave." Hadden then told Hobbs that he had beaten and raped a woman; that he "was drunk and just snapped." Hadden then hurriedly drove out of Rock Springs but stopped several miles down the road to clean up. Hadden told Hobbs never to speak of the matter again or he would kill him.

[¶ 12]    Hobbs also conceded that, after returning to Florida, the Haddens separated and Hobbs's relationship with Amy Hadden blossomed into a sexual relationship (he was then 16, and she was about 28). Mrs. Hadden pumped him for information about her estranged husband, so he told her the story of the rape incident (by this time Hadden was living in Missouri with his new girlfriend). There were some inconsistencies, or discrepancies, in Hobbs's stories (he was interviewed several times by several different law enforcement officers), but he offered an explanation for that in the form of crediting his return to Rock Springs to testify for refreshing his memory. His memory was also aided by some photographs that were taken while on the ill-fated trip, particularly with respect to the hat that Hadden was wearing.

[¶ 13]    Expert testimony was admitted at trial, which established that blood antigens foreign to the victim's body were found in both her vagina and anus. Those blood antigens were consistent with Hadden's blood type, though it is also common to over 40% of the general population. Gas purchase records and telephone records placed Hadden in Wyoming at the time of the crime.

[¶ 14]    Based upon Hobbs's information, Hadden was arrested in Missouri and returned to Wyoming. Shortly after his return to Wyoming, Rock Springs police detective Steve Reekers interviewed Hadden. Hadden chose not to testify at trial, although he did make a statement to Detective Reekers while he was incarcerated in Sweetwater County, and that statement was related to the jury via the testimony of that police detective. Hadden related that he was in Rock Springs on August 5–6, 1999, and had attended a carnival with Hobbs and another truck driver. At the carnival Hadden and his companions met up with a couple of girls and made arrangements to meet them at the Saddle Lite Bar. He did meet the girls there, but they left soon after, and Hadden then had an encounter with the victim. Hadden related that the victim "came on" to him and eventually asked him to leave the bar with her, which he agreed to do. Outside in the parking lot the victim undid her pants, as well as Hadden's, and, as Hadden put it, she "run [*sic* ] her hand down in my pants." The two of them then got into the victim's car, with Hadden in the driver's seat, and began driving to what Hadden thought was her home. However, according to Hadden, the victim was by this time passed-out drunk, and so he drove back to the Saddle Lite Bar where he had parked his truck. Hadden then left the victim in her car and returned to his truck. Hadden claimed that he did not have sex with the victim, though he conceded his pubic hair might be found in the victim's car because he and the victim had fondled each other.

[¶ 15]    Hadden told Hobbs about the woman passed out in her car, and Hobbs said he was going to go out and get in her car, drive off, and see how long it would take the victim to figure out that it was no longer Hadden who was with her. Hadden also related that Hobbs had been after him to "find him a woman," and later in his story added that Hobbs had been after him that very night to "find him a woman." Hadden said he saw Hobbs drive off in the victim's car. Hadden then related that Hobbs re-

turned to the truck about 30 minutes later and said that the victim had figured out that he was not Hadden and she kicked him out of her car, and he had to walk back to the truck. Hadden said he looked at both the Flying J and the Outlaw Inn for a place to park his truck for the remainder of the night but because he could not find a place to park, he drove down the road about 20 miles to a rest area and stopped for the night. Hadden claimed that the victim had asked him for his hat and he had given it to her.

[¶ 16] Hadden went on to tell that Hobbs was now living with Hadden's ex-wife, and that they were both on drugs. Hadden was trying to get custody of his daughter and was having them both watched for drugs. He claimed that Hobbs said to him that he would see to it that Hadden never saw his daughter again. Hadden explicitly asserted that it had to have been Hobbs who had assaulted the victim. Hadden claimed that Hobbs knew that he had left his hat in the victim's car, so he was able to place Hadden in the victim's car. Hadden believed that Hobbs did all this to get back at him because Hadden was "coming down hard" on his wife and Hobbs about drugs and trying to get custody of his daughter. Hadden also thought that Hobbs believed that Hadden wanted to get back together with his wife and, therefore, he was trying to frame Hadden to prevent that from happening. Hadden had also disciplined Hobbs for driving one of Hadden's cars at 100 miles per hour with Hadden's daughter in the car, and because Hobbs had spanked his daughter causing bruises and welts on the child.

## DISCUSSSION

### Motion to Suppress Statement

[¶ 17] Our standard of review here is well established. We review such an issue *de novo*. We defer to the trial court's findings of fact unless those findings are clearly erroneous, and the evidence is reviewed in a light most favorable to the trial court's determination because the trial court has the opportunity to hear the evidence and to assess the credibility of witnesses. *Lara v. State*, 25 P.3d 507, 510 (Wyo.2001).

[¶ 18] Hadden gave a statement to a police detective on May 8, 2000, while in custody. It clearly was not intended as a "confession," but in combination with other evidence, especially Hobbs's testimony, it was, perhaps, the most damning evidence against Hadden, both in terms of what it revealed and what it conveniently glossed over. Hadden contends that his statement should have been suppressed because it was obtained in violation of his right to counsel. This issue was not raised in the trial court in the manner contemplated by W.R.Cr.P. 12.[2]

### Rule 12. Pleadings and motions before trial; defenses and objections.

(a) *Pleadings and motions.* Pleadings in criminal proceedings shall be the indictment, the information or the citation, and the pleas entered pursuant to Rule 11. All other pleas, demurrers and motions to quash are abolished, and defenses and objections raised before trial which heretofore could have been raised by one or more of them shall be raised only by motion to dismiss or to grant appropriate relief, as provided in these rules.

(b) ***Pretrial motions.*** **Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:**

(1) Defenses and objections based on defects in the institution of the prosecution;

(2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings);

(3) **Motions to suppress evidence;**

(4) Requests for discovery under Rule 16; or

(5) Request for a severance of charges or defendants under Rule 14.

---

**2.** W.R.Cr.P. 16(a) provides for the discovery of any statements made by a defendant.

(c) *Mental illness or deficiency.* If it appears at any stage of a criminal proceeding by motion or upon the court's own motion, that there is reasonable cause to believe that the defendant has a mental illness or deficiency making the defendant unfit to proceed, all further proceedings shall be suspended and an examination ordered as required by W.S. 7–11–301, et seq.

(d) *Motion date.* Unless otherwise provided by local rule, the court may, at the time of the arraignment or as soon thereafter as practicable, set a time for the making of pretrial motions or requests and, if required, a later date of hearing.

(e) *Notice by state of intention to use evidence.*

(1) At Discretion of State. At the arraignment or as soon thereafter as is practicable, the state may give notice to the defendant of its intention to use specific evidence at trial in order to afford the defendant an opportunity to raise objections to such evidence prior to trial under subdivision (b)(3).

(2) At Request of Defendant. At the arraignment or as soon thereafter as is practicable the defendant may, in order to afford an opportunity to move to suppress evidence under subdivision (b)(3), request notice of the state's intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16, subject to any relevant limitations prescribed in Rule 16.

**(f) *Ruling on motion.* A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.**

(g) *Effect of failure to raise defenses or objections, or to make requests.* **Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (d), or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.**

(h) *Records.* A verbatim record shall be made of all proceedings at the hearing, including such findings of fact and conclusions of law as are made orally.

(i) *Effect of determination.* If the court grants the motion based on a defect in the institution of the prosecution or in the indictment or information, it may also order that the defendant be continued in custody or that bail be continued for a specified time not to exceed 48 hours pending the filing of a new indictment or information.

(j) *Production of statements at suppression hearing.* Except as herein provided, Rule 26.2 shall apply at a hearing on a motion to suppress evidence under subdivision (b)(3). For purposes of this subdivision, a law enforcement officer shall be deemed a witness called by the state, and upon a claim of privilege the court shall excise the portion of the statement containing privileged matter.

(Emphasis added.)

[¶ 19] The matter was first broached to the trial court [3] for discussion in the form of an oral motion early on the second day of trial; indeed, the trial court expressed what might best be characterized as surprise at the development. For this reason, the record does not contain the sorts of evidentiary materials that might be generated by a motion to suppress a statement, nor does it contain the more detailed oral and/or written findings that are created when such a motion is made, and therefore decided, before trial. The record reflects this:

COURT: You know, I think the Defendant can raise it at any time [motion to suppress his statement]. I can yell at these two for not bringing it up sooner,

---

3. We take note that the motion to suppress was renewed as a part of a motion for new trial, though that fact adds nothing of significance to our discussion and resolution of the issue.

and you know, I can scowl at them and chastise them, which I'm going to do, but I—I think as a constitutional right, the Defendant can bring it up at any time as a procedural matter, you know. I wish these—the Defense attorneys would have brought it up earlier, but—but having heard that and I have never seen this, I never knew this was coming, but just from what you read, Mr. Harton, from the statement, certainly, I have to agree with the State, you know, that this was a voluntary waiver.

I think the Detective was was correct in trying to find out what—what it was that Mr. Hadden wanted, because he seemed to be sending out somewhat of a mixed signal, but I think his waiver—he had his choice before him, and he made his choice, and there is nothing in what I heard you read where the officer misrepresented anything or tried to mislead him. So your—your Motion to Suppress—is that what you called it?

MR. HARTON: Yes, sir,

COURT: is denied.

[¶ 20] By its actions, the trial court determined that Hadden did not waive this issue through his failure to raise it in a timelier manner. However, we do not intend by the rendering of this opinion to establish that such a late motion cannot have the effect of waiving such an issue, even one of constitutional dimensions. We have set out the information Hadden related during the rendition of his statement in our summary of the facts of this case. Below, we set out the portion of the transcript of that statement which gives rise to the instant issue:

REEKERS: Today's date is 5/8 of 00. I'm Detective Steve Reekers of the Rock Springs Police Department. With me is John....

HADDEN: Hadden.

REEKERS: Hadden and, uh, we're talking about the case.... I want to ask him some questions here about case number 99–9454, reference an assault that took place in Rock Springs in the fall [sic] of '99 and before I do that I want to advise you of what your rights are. And I've got in front of you a form, I'll just read it to you as you follow along. Today .... actually the place is the Rock Springs Police Department, that's where I'm from but you, you, you're aware of where you're at? It's actually Green River, Wyoming?

HADDEN: Right.

REEKERS: Okay, in County Jail. But before we ask you any questions you must understand your rights as in you have the right to remain silent, anything you say can be used against you in court, you have the right to talk to a lawyer for advice before we ask any questions and to have him with you during any questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer any questions without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer. You understand these advisements?

(Hadden's response inaudible)

REEKERS: Okay. There's a little line behind each one. If you wouldn't mind, just initial that you understand.

(Pause)

REEKERS: Okay, now the next part is, is a waiver of rights. I'm just asking you if you understand these rights and if you're willing to talk to me. So here it says I have read this statement of my rights and I understand what my rights are and willing to make a statement of .... statement and to answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. What I want to do is question you about this assault and hear your side of the story is what I'm asking you. But I'm going to do so with your advisement .... the advisement of your rights.

HADDEN: Right.

REEKERS: Do you wish to waive these rights and give me a statement about what happened? Your side .... like Paul Harvey's, your .... the rest of the story. Your side of the story.

HADDEN: Um, I mean I do want a lawyer, yes. But I mean, I do, I want to get this on the way. You know, get....

REEKERS: Mm hmm.

HADDEN: .... you know, get this over with. Because I didn't do what I'm being charged for.

REEKERS: You didn't do what?

HADDEN: I didn't do what I'm being charged for.

REEKERS: You didn't do it .... okay. Well, what is your answer then? Would you like to talk to me about it? Or you want to take your rights under advisement here? I can answer questions for you when, uh, at the same time. But at this point in time it's open, uh, and your decision what you want to do.

HADDEN: Will I still have the right to a lawyer?

REEKERS: At any time that you want to. As .... you have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning time and then if you .... down at the bottom, if you decide to answer questions now without a lawyer present you will still have the right to stop answering any questions. So if, say, five minutes into this you decide that you won't answer any more questions, all you got to do is say you don't want to answer any more questions, you want a lawyer. The choice is up to you. You're not on any medication or....

HADDEN: No.

REEKERS: .... anything like that? No? Okay. This signing of the waiver, uh .... just acknowledges that, that I gave it to you.

HADDEN: Right.

REEKERS: If you don't sign it I just put a note on there that you didn't sign it. But, uh, I would like to know what your decision is on this and we'll just go from there.

HADDEN: How long will it take to get a lawyer?

REEKERS: How long would it take? Boy, that's different for every circumstance. Um, probably in yours since you're not a resident from around here, um, I would imagine you're going to go for a court appointed? You're nodding your head yes.

HADDEN: Yes.

REEKERS: Okay.

HADDEN: I'd like to, yeah.

REEKERS: Okay, so .... time is .... arraignment, uh, you fill out papers to apply for the court appointed lawyer and then go from there. And then it goes to the public defender's office and then they have several (inaudible) so, you know, we're not talking a day or two. It takes a little bit of time to actually get a court appointed lawyer unless you, uh, wish to obtain one yourself by some type of financial aid or whatever you can get and find one here, on your own.

HADDEN: Yeah.

REEKERS: But I'm here to ask you if you want to give a statement about, uh, these allegations against you. And first I want to advise you of what your rights are. And you're asking good questions here on what to do.

HADDEN: 'Cause I've always been told, you know, for any kind of trouble we'll have a lawyer before we answer any questions.

REEKERS: Mm hmm. And that's an individual choice. And you're a person of sound mind, it appears, and you understand everything I'm telling you and you can read the English language and did you graduate from high school?

HADDEN: No.

REEKERS: No? what's your highest level.

HADDEN: Eleventh grade.

REEKERS: Eleventh Grade? Okay, you ever get a GED?

(Hadden's response inaudible)

REEKERS: Okay, yes?

HADDEN: Yes.

REEKERS: Okay, um. .... That's about the level, this understanding is, uh, pretty much high school or junior high level. Where most adults can understand this. The choice is totally up to you. Um,

obviously I'm here for the interests of this investigation, I want to hear, hear your side of this, uh, allegation. If, if you want to wait for a lawyer that's up to you, but that's a choice you gotta make here.

HADDEN: Yeah I, I'll read a statement.

REEKERS: Okay. Uh, if you would, just go ahead and put an X here. Just keep in mind, again, you can decide at any time during the questioning .... you can change that mind.

[¶ 21] At no time during the interview did Hadden ask for an attorney. The entire interview appears to have lasted for less than one hour. He now contends that the district court erred as a matter of law in finding that his exercise of his right to counsel was equivocal, and that the police were required to cease questioning Hadden, or at least attempt to clarify Hadden's equivocal exercise of the right to counsel. Of course, the upshot of Hadden's claim is that his statements to the police should not have been admitted in evidence, and their admission in these circumstances requires reversal.

[¶ 22] We hold that the district court was correct in ruling that Hadden's statements were admissible. The United States Supreme Court recently held:

> To recapitulate: We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.

*Davis v. United States,* 512 U.S. 452, 462, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (emphasis in original).

[¶ 23] In *Davis,* the defendant was given *Miranda* warnings, and he then waived his right to remain silent and to consult with an attorney prior to questioning. During his interview,[4] Davis said, "Maybe I should talk to a lawyer." Davis was told that he had a right to an attorney but then responded that he did not want an attorney. Later in the interview, he said, "I think I want a lawyer before I say anything else." At that point, the interview ceased. *Id.,* 512 U.S. at 454, 114 S.Ct. 2350. The Supreme Court's reasoning continued:

> The *Edwards* rule—questioning must cease if the suspect asks for a lawyer—provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that *might* be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong. We therefore hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.

*Id.,* 512 U.S at 461, 114 S.Ct. 2350 (emphasis in original).

[¶ 24] The Supreme Court concluded its analysis stating that the courts below found that Davis's remark "Maybe I should talk to a lawyer" was not a request for counsel, and it found no reason to disturb that conclusion. *Davis,* 512 U.S at 462, 114 S.Ct. 2350. The Tenth Circuit Court of Appeals has applied that rule in similar circumstances. *United States v. Zamora,* 222 F.3d 756, 766 (10th Cir.2000) (Zamora's statement that he "might want to talk to a lawyer" was ambiguous, as Zamora appeared to be thinking out loud, and questioning was not required to cease).

---

4. It appears that Davis's interview was not tape-recorded, and the rendition of these facts relied on the testimony of Davis and the interviewing officers. Here, the statement was tape-recorded, and, as this case makes evident, a tape recording can be as valuable to the State as it is to a defendant. *See Lara v. State,* 25 P.3d 507, 511 (Wyo.2001).

[¶ 25]   We adopt the rule espoused by *Davis* and *Zamora*.   In doing so, we have consulted with the views of our brethren in many jurisdictions and find them to be in agreement with the rule as well.   *State v. Simmons*, 2000 MT 329 ¶¶ 19–24, 303 Mont. 60, ¶¶ 19–24, 15 P.3d 408, ¶¶ 19–24 (2000) (although defendant at first indicated he wanted an attorney, he then said, "I do not want an attorney present just for this part, no"—and answered questions asked of him); *Harte v. State*, 13 P.3d 420, 428–29 (Nev. 2000) (During the course of his interview, Harte said, "Just out of curiosity, when do I get to talk to a lawyer?"; "I . . . . they . . . . they told me, you know, that they thought I should talk to a lawyer whatever"; "I don't wanna be a bitch and say, you know, give my [*sic*] lawyer.   But I mean;" and, "What do you think a lawyer would tell me right now?"; however, in full context of interview and clarity of *Miranda* warnings given, those statements were ambiguous); *People v. Tally*, 7 P.3d 172, 179–81 (Colo.App.1999) (Although the defendant asked many questions about his right to counsel, he ended up saying, "Yeah, I'll talk to you."); *State v. Whipple*, 134 Idaho 498, 5 P.3d 478, 482 (Idaho App. 2000) (adopting *Davis* rule, but in context of right to remain silent where defendant repeatedly said, "No more!" to questions being put to him); *Stemple v. State*, 2000 OK CR 4 ¶¶ 9–10, 994 P.2d 61, ¶¶ 9–10 (Okla.2000) ("I feel as though I should have an attorney," was equivocal response); *State v. Kiriluk*, 1999 UT App 30 ¶¶ 7–8, 975 P.2d 469, ¶¶ 7–8 (Utah App.1999), (defendant's response of "I don't," when asked if he had anything to say about evidence found in his apartment not unambiguous request for counsel or to remain silent); *State v. Donesay*, 265 Kan. 60, 959 P.2d 862, 871 (1998) (adopting rule in context of right to remain silent); *Braboy v. State*, 130 Md.App. 220, 745 A.2d 471, 477–79 (2000) ("I want a lawyer but I can't afford a lawyer," not an unambiguous exercise of right to counsel where defendant decided to talk after he was informed that a lawyer would be appointed for him if he could not afford one); *Goodner v. State*, 714 N.E.2d 638, 641 (Ind.1999) (Goodner equivocated about whether or not he should talk without a lawyer, but ultimately signed written waiv-

er and talked); *State v. Brown*, 589 N.W.2d 69, 72–74 (Iowa App.1998) (defendant's statement, "Is my lawyer here?" not an unambiguous request for counsel); *State v. Greybull*, 1998 ND 102 ¶¶ 8–9, 14–21, 579 N.W.2d 161, ¶¶ 8–9, 14–21 (N.D.1998) (defendant's statements, "You can't make me say nothing," "Do I have to get a lawyer?" and "Do I need to get a lawyer?" ambiguous under *Davis* ); *Cothren v. State*, 705 So.2d 849, 851–55 (Ala. Crim.App.1997) ("I think I want to talk to an attorney before I answer that," ambiguous under circumstances of case);   but *see Billups v. State*, 135 Md.App. 345, 762 A.2d 609, 614–16 (2000) (defendant signed signature line on form which purported to waive his rights to remain silent and have counsel, but wrote "NO" by his signature construed to be unequivocal exercise of right to remain silent and have an attorney).

[¶ 26]   The list of cases cited above is by no means exhaustive, and we concede that there are cases to the contrary.   *See, e.g., State v. Jones*, 102 Wash.App. 89, 6 P.3d 58, 61–62 (2000) (Washington declined to adopt *Davis* rule);   and *State v. Rogan*, 91 Hawai'i 405, 984 P.2d 1231, 1249 (Hawai'i 1999) (according broader rights under Hawai'i Constitution.   However, we find the *Davis* decision and its progeny convincing, and we adopt that rule for Wyoming.

**Sufficiency of Evidence**

[¶ 27]   Hadden claims that the evidence is insufficient to sustain his conviction, particularly in light of the victim's inability to identify him as her attacker, but also because of the inherent unreliability of Hobbs's testimony, as well as the extremely circumstantial nature of the other evidence that pointed to Hadden's guilt.   The benchmark for review of sufficiency of the evidence claims is whether the evidence, when viewed in the light most favorable to the State, is such as to permit a reasonable trier of fact to find guilt beyond a reasonable doubt.   *Statezny v. State*, 2001 WY 22 ¶ 15, 18 P.3d 641, ¶ 15 (Wyo.2001).

[¶ 28]   The victim was unable to identify Hadden, but her testimony did not eliminate him as the attacker.   Hobbs testified that Hadden told him he had raped a

woman in Rock Springs on the night of August 6, 1999, and that he returned to the truck they shared bloodied and in a hurry to get out of town. Hadden countered that testimony with a theory that Hobbs was telling lies in order to frame him. It was for the jury to decide Hobbs's credibility and whether he was capable of somehow making up a story such as that he told in considerable detail. The circumstantial evidence, including the hat, fuel records, phone records, and body fluids, was, perhaps, somewhat ambivalent in terms of inculpating Hadden but could serve to point to guilt in light of Hobbs's testimony. Finally, Hadden's statements to the police admitted most of the occurrence with the critical exception of the beating and the rape. It is evident from the tape of that statement that Hadden's "story" had many of the ear-markings of a lie, and that, too, is apparently what the jury decided. We conclude that the evidence was sufficient for the jury to reach a verdict of guilty.

**Instruction Errors**

[¶ 29] Jury instructions should inform the jurors concerning the applicable law so that they can apply that law to their findings with respect to the material facts; instructions should be written with the particular facts and legal theories of each case in mind and often differ from case to case since any one of several instructional options may be legally correct; a failure to give an instruction on an essential element of a criminal offense is fundamental error, as is a confusing or misleading instruction; the test of whether a jury has been properly instructed on the necessary elements of a crime is whether the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed. *Mueller v. State,* 2001 WY 134, ¶ 9, 36 P.3d 1151 ¶ 9 (Wyo.2001); *Schmidt v. State,* 2001 WY 73, ¶ 23, 29 P.3d 76, ¶ 23 (Wyo.2001); *Metzger v. State,* 4 P.3d 901, 908 (Wyo.2000).

[¶ 30] First, Hadden contends that the trial court erred in giving an instruction on witness credibility. Although the case of *Gentry v. State,* 806 P.2d 1269 (Wyo.1991) is pertinent to our discussion, it is distinguishable in several respects. Gentry contended

that his conviction boiled down to whether the jury believed him or a police officer who alleged that Gentry confessed to him. *Id.,* at 1270. The trial court did not permit Gentry himself to inform the jury that he had a prior felony conviction before he testified, but did allow the State to use the conviction as impeachment evidence against him. Gentry contended that error violated his constitutional rights under the circumstances of his case because that matter was so critical to his credibility. In that trial, this instruction was given to the jury:

You will decide which witnesses you believe and how much weight you give their testimony. In deciding what you believe, you may consider anything about a witness which tends to prove or disprove truthfulness, including the following:

1. His conduct, attitude, and manner while testifying;

2. His physical and mental capacity to have heard or seen that about which he testifies;

3. His ability to remember and to tell here in court what he has heard or seen;

4. His reputation for honesty and truthfulness or for dishonesty and untruthfulness;

5. Whether he has a bias or prejudice, an interest in the outcome of the trial, or any other motive for not telling the truth; and

6. Whether the facts he related are inherently believable or unbelievable.

In evaluating witness credibility other facts are also important.

1. You should consider statements by a witness that are either consistent or inconsistent with testimony given in court.

2. If a witness admits to untruthfulness at some other time, you may consider that admission but you should take into account all the circumstances surrounding it; for instance, whether it was a sworn statement, whether it was made under pressure, whether it was self-serving and whether it was an important or merely a minor misstatement.

3. If you conclude that a witness has willfully lied under oath about any material

fact in this case you may distrust all of his testimony. On the other hand, if you think it is reliable, considering all the other evidence, you may still believe it.

Differences between one witnesses' [*sic*] testimony and that of others, does not necessarily mean someone is untruthful. Two persons who witness an incident may see or hear it differently. In resolving differences in testimony, you should consider all the circumstances of the case whether the discrepancy concerns an important fact or a trivial one.

You should not decide a fact based on the number of witnesses who testify about it. The testimony of one witness you believe, considering all the circumstances of the case, is sufficient to prove any point.

We described that instruction in these terms:

In other words, a witness's credibility is a quilt of many patches: demeanor, forthrightness, apparent motives, internal consistency of testimony, external consistency of testimony when compared to other witnesses' testimony, and plausibility of the witness's testimony in relation to the jury's combined life experiences. No one of these patches is a talisman for the jury; instead, it is in their interrelationship as perceived in the collective mind of the jurors that they have significance and effect. Probably, the whole is larger than the individual parts.

*Gentry,* 806 P.2d at 1273–74.

[¶ 31] In this case, the district court gave the following instruction over Hadden's objection:

Discrepancies in a witness' testimony or between the testimonies of that of others, if there were any, do not necessarily mean that the witness should be discredited. Failure of recollection is a common experience; and innocent misrecollection is not uncommon. It is a fact, also, that two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance.

As a part of the introductory instructions, the trial court also informed the jury of its role with respect to the credibility of witnesses:

The jury is the sole judge of the credibility of witnesses, and of the weight to be given their testimony. You should take into consideration their demeanor upon the witness stand, their apparent intelligence, their means of knowledge of the facts testified to, the interest, if any, which any witness may have in the outcome of this trial, the prejudice or motives, or feelings of revenge, if any, which have been shown by the evidence. In so doing, you may take into consideration all of the facts and circumstances in the case and give such weight as you think the same are entitled to, in the light of your experience and knowledge of human affairs.

If you believe from the evidence in this case that any witness swore falsely to any material fact in this case, then you are at liberty to disregard all or any part of the testimony of that witness, except insofar as the testimony has been corroborated by other and credible evidence, and the facts and circumstances proved during the trial.

In determining the weight to be given to an opinion expressed by a witness who did not testify as an expert, you should consider the credibility of the witness, the extent of the witness's opportunity to perceive the matters upon which the opinion is based and the reasons, if any, given for it. You are not required to accept such an opinion but should give it the weight to which you find it entitled.

[¶ 32] Hadden objected to this "discrepancy" instruction on the basis that it was covered by the other instructions. He offered no alternative instruction because he did not want an alternative instruction; thus, the State's argument that we should not consider this issue because Hadden did not offer an alternative instruction is unavailing. The State also contends that we must evaluate this contention of error under the plain error doctrine because Hadden did not object enough. We disagree. Hadden did object and for reasons that were sufficiently clear on the record that we must give this error plenary review. In making its decision to give the instruction, the trial court said:

COURT: The Court intends to give Instruction No. 8. As I told you in the informal instructions, the State had presented a three-page long instruction that had been given in *Gentry*. I felt that it was much too repetitive, went over it into detail and was covered at least generally by the instructions you mentioned. This is a—a very condensed version of that. I think this will help the—the jury based on the testimony we've heard, both from the State's witnesses and Defense witnesses, and I think this is an accurate statement of the law and will assist the jury.

[¶ 33] The district court would have made a sounder decision by either giving the full *Gentry* instruction or giving no instruction at all. The State makes no cogent argument that the instruction is a proper instruction nor does it offer any pertinent authority in that regard. Our research efforts found no case law that would sustain the giving of the instruction. On its face, it appears to be an instruction given with pertinence primarily to the testimony of Christopher Hobbs, whose various renditions of what happened in Rock Springs varied in some of the more immaterial details (*e.g.*, whether or not they were "bobtailing" in the tractor, *i.e.*, driving around in the truck, without the trailer attached). It would have been better for the district court to refuse that instruction, and we hereby specifically disapprove of its use. However, given the totality of the instructions, we can assign it no more than the status of harmless error. W.R.A.P. 9.04 and W.R.Cr.P. 52.

[¶ 34] In addition, Hadden contends that the following instruction on the subject of "flight" was erroneously given to the jury over Hadden's objection:

Flight, by itself, is not sufficient to establish the guilt of the defendant. But it may be considered as a circumstance to be considered with other factors as tending to show a consciousness of guilt.

[¶ 35] In *Germany v. State*, 999 P.2d 63, 69–70 (Wyo.2000), we briefly discussed the use of a flight instruction in a wholly different context. Here the issue arises, and the instruction was given, based upon Hobbs's testimony that on the night of the crime, Hadden returned to the truck and wanted to flee Rock Springs as quickly as possible, with Hobbs to act as a lookout. In his statement to the police, Hadden contended that he left Rock Springs because he could find no suitable place to park his truck in Rock Springs so that he could rest for the night. The following quotation from 23A C.J.S. *Criminal Law* § 1332 (1989 and Supp.2001) serves well to summarize the historical view of this aspect of criminal law:

In appropriate circumstances, the court may instruct the jury that they may draw an inference of guilt from accused's flight, considered in connection with all other evidence.

Such an instruction should be given only where there is evidence of flight immediately after the crime, and of accused's knowledge of the crime for which he was sought, and the links along the extended chain of inference from accused's behavior to actual guilt of the crime charged are unbroken, so that the flight has considerable probative value, and the court can draw a reasonable inference that accused fled because he is guilty. Mere unexplained nonappearance at trial is insufficient evidence of flight. An instruction is inappropriate in various circumstances. Moreover, it has also been held that it is reversible error for the court to charge a jury on flight, although the prosecution may still offer evidence of and argue flight.

However, it has been held that the charge may be given even where the flight alone is not sufficient to establish guilt, or the flight was not immediate, or there is no direct evidence that accused fled to avoid criminal charges, or the flight is not established by proof beyond a reasonable doubt, or accused ultimately surrendered. Accused need not have left the jurisdiction or actively evaded the police.

The court should caution the jury that flight does not necessarily reflect consciousness of guilt, and that consciousness of guilt does not necessarily reflect guilt, but need not enumerate all possible innocent explanations for the flight offered by accused.

The court need not charge that failure to flee gives rise to an inference of innocence. Where accused has surrendered, the court need not charge that the surrender was voluntary, as this is a factual issue.

[¶ 36] After many years of debate and characterizing a flight instruction as serving no real purpose, "as it is a particularization of the general charge on circumstantial evidence," the Supreme Court of Georgia prohibited the giving of such an instruction and propounded the rule that the giving of such an instruction is reversible error. *Renner v. State*, 260 Ga. 515, 397 S.E.2d 683, 686 (1990).

[¶ 37] In Illinois Pattern Jury Instructions Criminal (4th ed.2000), we find the following note where a suggested instruction on flight might otherwise appear:

### 3.03 Flight

Committee Note

The Committee recommends that no instruction be given on this subject.

Although evidence of flight is a proper subject of argument, its probative value is questionable. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); see also *United States v. Jackson*, 572 F.2d 636 (7th Cir.1978). The use of flight instructions has frequently been found to constitute error. See, *e.g., People v. Henderson*, 39 Ill.App.3d 502, 348 N.E.2d 854 (3d Dist.1976) (Stouder, J., specially concurring) (collecting cases). For these reasons, the Committee believes that a flight instruction should not be given.

[¶ 38] In 1 Josephine R. Potuto, Steven A. Saltzburg, Harvey A. Perlman, Federal Criminal Jury Instructions, Part One, Chapter 3: Closing Instructions § 3.51, FLIGHT AND RELATED EVIDENCE (2nd ed. with 1993 Supp.) we find the following note:

No instruction is provided on flight evidence or the defendant's conduct after a crime. These instructions focus on a single aspect of circumstantial evidence and may unduly emphasize that aspect. Arguments concerning the probative value of flight and the defendant's conduct should be left to the parties in their closing arguments to the jury.

[¶ 39] We find that the instruction given in this case was consistent with the law as it existed at the time this case was in trial, and that it was not prejudicially erroneous, given the facts and circumstances of this case. W.R.Cr.P. 52 and W.R.A.P. 9.04. However, we agree with the sentiments expressed in the authorities cited above, and, to avoid future problems, we hold that hereafter (that is, cases tried after the date on which this opinion appears in the advance sheets of Pacific Reporter Third) the giving of a flight instruction to the jury, in a criminal case, shall be reversible error. In this instance, Hobbs testified to both Hadden's admission to committing the assault and rape and to Hadden's decision to "flee" Rock Springs late at night on the date of the crime. However, the gravamen of Hobbs's testimony was to establish the commission of the crime itself, whereas the "flight" was peripheral to, and merely fleshed out, the entire story of that evening's events from Hobbs's perspective. We are comfortable in concluding that, given these circumstances, to the extent it played a role in the jury's determination of guilt, the flight instruction was not prejudicial.

## CONCLUSION

[¶ 40] As set out more fully above, the trial court did not err in denying Hadden's motion to suppress the statement he made to the police, there is sufficient evidence to sustain Hadden's conviction, and the trial court did not commit reversible error in instructing the jury. However, as is also set out more fully above, the giving of a flight instruction after the date this case is published in the advance sheets of Pacific Reporter Third shall constitute reversible error. The judgment and sentence of the district court are affirmed.