2004 WY 115
CHON ASCENSION GONZALES PEÑA, Appellant (Defendant),
v.
THE STATE OF WYOMING, Appellee (Plaintiff).
No. 03-13
Supreme Court of Wyoming. APRIL TERM, A.D. 2004.
October 6, 2004
Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; Ryan R. Roden, Senior Assistant Appellate Counsel. Argument by Mr. Roden.
Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Dee Morgan, Assistant Attorney General; Theodore E. Lauer, Director, and Eric Phillips, Student Intern, of the Prosecution Assistance Program. Argument by Mr. Phillips.
Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.
GOLDEN, Justice.
[¶1] Chon Ascension Gonzales Pena (Pena) appeals his conviction for first and second degree murder. Pena argues that the district court erred in denying two separate motions to suppress and that there was insufficient evidence to support the premeditation requirement of first degree murder. Finding no reversible error, we affirm.

ISSUES
[¶2] Pena presents three issues for this Court's review:
I. Whether the district court erred in denying appellant's motion to suppress his statement in violation of his rights under the United States Constitution and Article 1, § 11 of the Wyoming Constitution.
II. Whether the district court erred in denying appellant's motion to suppress the search of his mobile home, in violation of his rights against unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution.
III. Whether there was insufficient evidence to support appellant's conviction for first degree murder based upon the essential element of "premeditation."
The State rephrases the issues as:
I. Did the district court properly deny appellant's motion to suppress his statement to law enforcement officers made on March 14, 2001, at the Limon, Colorado, Correctional Facility?
II. Did the district court properly deny appellant's motion to suppress the evidence obtained in the search of the mobile home occupied by appellant and the two victims, in which the two victims were killed?
III. Did the State present sufficient evidence to permit the jury to find beyond a reasonable doubt that appellant killed Yensena Gonzales Mancha Fierro purposely and with premeditated malice?

FACTS
[¶3] Pursuant to our standard of review, the following are the facts viewed in the light most favorable to the State. In July 1996, Pena lived near Powell, Wyoming, in a mobile home with his wife, Yensena Gonzales Mancha Fierro (Yensena), Yensena's two brothers Manuel and Jose, and Pena's 13 year-old daughter, Stephanie. On July 23, 1996, Pena and Yensena became involved in an argument. The argument continued over several hours and escalated as it continued. The argument involved only Yensena and Pena, not any of the other residents of the household.
[¶4] Yensena started packing her bags to leave the home. Yensena, crying, walked out of the mobile home. Pena retrieved a rifle from his bedroom, loaded it with at least seven hollow-point bullets, and angrily followed her. As he went after her with his rifle, he yelled out that he was going to kill her. Yensena returned to the mobile home and told her brothers to pack because they were leaving for Mexico. Pena was still following her carrying the rifle. Yensena was still crying. Pena and Yensena went into the bathroom. Pena sat on the edge of the bathtub holding the rifle. Still crying, Yensena gave Jose clothes to pack. Yensena handed Jose three bunches of clothes, which Jose put on Yensena's bed. Because Yensena and Pena were still arguing, Jose left them and went and sat on the couch and started watching TV. Within a few minutes Manuel, Jose and Stephanie, who were all sitting in the living room watching TV, heard a gunshot, then a woman scream and felt the trailer shake as Yensena fell. Pena shot Yensena twice in the back. About thirty minutes had elapsed since the time Pena retrieved his rifle, loaded it, and told Yensena he was going to kill her.
[¶5] Manuel, upon hearing the gunshots, headed towards the bathroom with Jose close behind him. Pena saw Manuel in the hallway and shot Manuel. Jose ran from the mobile home and hid. Jose heard several more shots as he was running. Stephanie heard one shot coming from the bathroom, and then heard the initial shots that hit Manuel and saw Manuel fall. She then witnessed Pena shoot Manuel in the face at close distance as Pena was standing over Manuel's body. Pena shot Manuel at least three times. Pena, still holding the rifle, told Stephanie to run and she ran to her aunt's nearby mobile home. Pena fled and was not found until March of 2001 when he was located in the Limon, Colorado, Correctional Facility. Further facts will be developed as necessary in the discussion of the issues.

DISCUSSION

I. Motion to suppress statement
[¶6] Pena was contacted in the Limon, Colorado, Correctional Facility by two law enforcement officers from the Park County, Wyoming, Sheriff's Office: Dave Doyle and Tom Thompson. The officers conducted an interview with Pena regarding the deaths of Yensena and Manuel. On appeal, Pena argues that his statements from this interview should be suppressed because he affirmatively invoked his right to remain silent and that his statements were not voluntarily.

Standard of Review
[¶7] The State does not dispute that the statement was a result of a custodial interrogation. Thus, in reviewing the order of the district court denying Pena's motion to suppress, this Court is guided by a well-established body of law:
To comply with Miranda, law enforcement must advise an accused of his rights before any of the accused's statements, made during custodial interrogation, can be used against the accused at trial. Kolb v. State, 930 P.2d 1238, 1243 (Wyo. 1996); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Failure to comply with these procedural safeguards requires the court to suppress such statements. We review the record to determine whether the trial court could conclude, given the totality of the circumstances, that the police sufficiently followed Miranda. Kolb, 930 P.2d at 1240.
Moreover, even when Miranda has been complied with, the United States Constitution, amendments V and XIV, as well as the Wyoming Constitution, art. 1, §§ 6 and 11, require admissions and statements to be voluntary. Doyle v. State, 954 P.2d 969, 971-72 (Wyo.1998); State v. Evans, 944 P.2d 1120, 1124 (Wyo.1997). To be voluntary, the defendant's statements must result from "free and deliberate choice rather than intimidation, coercion, or deception." Madrid v. State, 910 P.2d 1340, 1344 (Wyo. 1996). Because we presume a defendant's statements to be involuntary, the burden rests on the State to show, by a preponderance of the evidence, that the defendant's statements were voluntary. Evans, 944 P.2d at 1126-27. Once the State has met its burden and rebutted the presumption of involuntariness, the defendant may be required to present evidence demonstrating the involuntariness of his statements. Id. at 1126. If such statements resulted from coercion, then the statements are inadmissible at trial for any purpose because their validity is suspect. Id. at 1125.
Voluntariness is a legal question; thus, we review the ultimate issue, whether a defendant's statements were voluntary, de novo. Miller v. Fenton, 474 U.S. 104, 110, 106 S.Ct. 445, 449-50, 88 L.Ed.2d 405 (1985); Doyle, 954 P.2d at 972; Simmers v. State, 943 P.2d 1189, 1194 (Wyo.1997); Evans, 944 P.2d at 1124. On review, however, we will not disturb the trial court's findings of fact unless clearly erroneous. Id. We look to the totality of the circumstances to determine if the defendant's statements were voluntary. Vigil v. State, 859 P.2d 659, 664 (Wyo.1993).
Mitchell v. State, 982 P.2d 717, 720-21 (Wyo. 1999).

Discussion
[¶8] On appeal, Pena argues that he affirmatively invoked his right to remain silent and that the district court did not conduct the required totality of the circumstances analysis to determine if Pena's statements were voluntary. Specifically, Pena argues that, as a Mexican national whose native tongue is Spanish, he could not understand what the officers were saying to him. Pena also claims that, in the totality of the circumstances of the interview, the atmosphere was oppressive and coercive. Pena claims he affirmatively invoked his right to remain silent several times during the interview but the officers continued to question him and told him they would not leave until he talked to them.
[¶9] The interview was recorded on audiotape to which the district court listened. The following is the pertinent portion of the interview as quoted by the district court in its decision letter:
Thompson read Defendant his Miranda rights and Defendant clearly acknowledged that he understood these rights. Nonetheless, Thompson continued,
[Thompson]: Do you understand you don't have to talk to us? Okay? Do you wish to talk to us?
[Pena]: Not, not really.[1]
[Thompson]: Not really? How do you mean not really? I mean, uh.
[Doyle]: Chon [Pena], you know, you know why we're here?
[Pena]: Yeah.
[Doyle]: In reference to a double homicide. And that's an open case that obviously we have to complete, and you are a big part of that. And that's why we're here, to talk with you about them.
[Pena]: Okay.
[Doyle]: We're going to proceed with that 
[Pena]: Uh, huh.
[Doyle]:  with or without you. But we're hoping, of course, for your cooperation in that, and that's why we drove all the way down here. Okay? Investigator Thompson has explained your rights to you, that are guarantee you, that are guaranteed to you under the Constitution. We're here to protect those rights, preserve your rights, and if you decide that you do not want to talk with us, that's fine. We're out of here.
[Pena]: Uh, hmm.
[Doyle]: If you decide to talk with us, that's great. We're going to stay here and talk with you, and then we're going to go ahead and leave anyway.
[Pena]: Well, I don't have nothing to say to you guys, you know? Whatevers. Go on, go on.
[Doyle]: Pardon me?
[Pena]: Said, whatever's you're going to do is fine to me. You know, that's, ah 
[Doyle]: Do you have any questions for us?
[Pena]: Not really.
[Doyle]: Okay.
At this point, Thompson goes back to asking Defendant questions about his real name versus the name he was using at the time of the interview. Then, Doyle moves on to the subject of fingerprints briefly before returning once more to whether Defendant clearly agrees to be interviewed about the murders.
[Doyle]: Chon, once again, and, and we need to know clearly from you 
[Pena]: Uh, huh.
[Doyle]:  with your constitutional rights in mind are you going to talk with us?
[Pena]: Well, I, you know, I don't have anything, uh, to talk to you guys, you know. Whatevers on, is on 
[Doyle]: Okay, all right. Let me, let me put it to you this way: We have questions that we need to ask of you.
[Pena]: Oh. Okay, well go ahead. It's fine, you know, I 
[Doyle]: So you agree to talk with us?
[Pena]: I'd be glad to answer.
In its decision letter, the district court states:
[T]he Court's review of the first part of the audiotape disclosed that Defendant was responsive and cooperative during this part of the interview. The officers did not use any coercive tactics and, contrary to the argument by counsel at the hearing, the officers did not say they were going to stay and question Defendant whether he cooperated or not. In fact, when taken in the context of the interview, Doyle was explaining that they were there in reference to the investigation of an "open case" double homicide that "obviously we have to complete" and that they came to Colorado to talk to the Defendant because he was a "big part" of their investigation. Defendant interjected "okay" indicating that he understood this and Doyle went on to complete his sentence saying they were going to proceed with that, referring to the completion of the open case, and would do so with or without the Defendant. Doyle qualified this by saying they were "hoping, of course, for your cooperation in that," again, in referring to the completion of the open case. He then goes on to explain that Thompson and him are there to protect and preserve Defendant's Constitutional rights, but "if you decide that you do not want to talk with us, that's fine. We're out of here."

Defendant's responses do not clearly invoke his right to silence. Counsel argued that the Defendant's statements, essentially that he didn't "have nothing to say to you guys," invoked his right to remain silent. However, when Doyle said "let me put it to you this way: We have questions that we need to ask you," it is fairly clear from the tone and inflection of his voice that he was seeking to clarify whether Defendant was invoking his right to silence or merely declining to make a formal statement to the officers. This is also reflected in Defendant's tone and inflection when he responded, "Oh. Okay, well go ahead. It's fine, you know, . . ." and then, "I'd be glad to answer."
We quote from the decision letter of the district court at length because, after our de novo review, we find that the district court appropriately analyzed the issue.
[¶10] When reviewing whether a motion to suppress should be granted, this Court must first determine if the Miranda rules have been complied with and then we must determine if any statements made were voluntary. "[W]henever the State obtains a confession it has the burden by a preponderance to demonstrate that the statement was not obtained in violation of the Miranda doctrine and that the statement was given voluntarily." Garcia v. State, 777 P.2d 603, 606 (Wyo. 1989).
[¶11] With regards to complying with Miranda, in this case, it is clear from the audiotaped interview that the officers complied with the dictates of Miranda. Pena's only argument on this issue is that he did not understand English well enough to understand his rights as they were explained to him. This contention is belied by the record. A complete review of the audiotape reveals that Pena had little trouble understanding and conversing with the officers. As found by the district court in its decision, and as verified by this Court upon its de novo review, the officers informed Pena of his Miranda rights and Pena clearly indicated he understood those rights. In fact, the officers told Pena he had the right to remain silent at least four times, and even directly asked Pena if he had any questions. Pena's responses to the officers did not indicate any confusion on his part. At the hearing on the motion to suppress the officers testified that they had no trouble communicating with Pena in English. Pena's daughter Stephanie also testified at trial that she communicated with Pena only in English and she and her father had no trouble understanding one another.
[¶12] Pena's next contention is that he affirmatively invoked his right to remain silent and the officers ignored his invocation. It is true that, once an accused has affirmatively invoked his constitutional right to remain silent, his invocation must be scrupulously honored[2] and questioning by law enforcement must cease.
Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.
Michigan v. Mosley, 423 U.S. 96, 100, 96 S.Ct. 321, 325, 46 L.Ed.2d 313 (1975). Pena argues that his statements including he did "not really" want to talk to the officers and that he had nothing to tell the officers were unambiguous invocations of his right to remain silent and the interview should have ceased. We agree with the district court that these statements were ambiguous with regards to whether or not Pena was affirmatively invoking his right to remain silent.
[¶13] James v. Marshall, 322 F.3d 103 (1st Cir. 2003), presents similar facts to this case. James was a suspect in a homicide investigation. A law enforcement officer read him his Miranda rights and then the following exchange ensued:
[Officer]: Do you wish to make a statement at this time?
James: Nope.
[Officer]: Okay. Can I talk to you about what happened earlier tonight?
James: Yup.
Id. at 105. The officer then proceeded to interview James. James moved to suppress his statements made during that interview arguing that he had invoked his right to remain silent when he said "nope" and no further questioning by law enforcement should have been allowed. The motion was denied. The Supreme Judicial Court of Massachusetts affirmed the denial of the motion to suppress stating:
In ruling on the defendant's motion, the judge found as a fact that by saying, "Nope," the defendant meant only that he did not wish to make a formal statement and not that he was unwilling to answer questions. We cannot say this determination was clearly erroneous. Immediately before and after that point, the defendant appears to have been quite willing to talk. The judge was warranted in concluding that the defendant did not suddenly change his mind about discussing the incident, but had no prepared speech.
Commonwealth v. James, 693 N.E.2d 148, 151 (Mass. 1998). Upon petition for habeas corpus relief, the First Circuit Court of Appeals also affirmed the denial of the motion to suppress:
After James says "Nope" to the inquiry about a formal statement, Sergeant Craig does not ignore his answer and forge ahead with questions about the deadly event. Instead, he asks him a question designed to clarify the meaning of his answer: "Okay. Can I talk to you about what happened earlier tonight?" James answers "Yup." Only then does the questioning about the events continue. This is precisely the kind of "good police practice" described by the Supreme Court in Davis [v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)], where the Supreme Court declined to adopt a rule requiring officers to ask clarifying questions in the face of an ambiguous assertion of the right to counsel, but noted that" when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." Davis, 512 U.S. at 461, 114 S.Ct. 2350. That was essentially what Sergeant Craig did here with respect to James's invocation of the right to remain silent.
James v. Marshall, 322 F.3d at 109. The same analysis applies to this case. Pena stated that he had nothing to say to the officers, but once the officers explained that they were not asking for a statement from him but instead simply wanted to ask him questions, his response was "I'd be glad to answer." This exchange clarified that Pena was not affirmatively invoking his right to silence.
[¶14] The officers were not required to stop their questioning until they had clarified if Pena truly was invoking his right to silence. In discussing an ambiguous invocation of the right to an attorney, the United States Supreme Court has stated it is simply good police practice to clarify any ambiguity:
In considering how a suspect must invoke the right to counsel, we must consider the other side of the Miranda equation: the need for effective law enforcement. Although the courts ensure compliance with the Miranda requirements through the exclusionary rule, it is police officers who must actually decide whether or not they can question a suspect. The Edwards rule  questioning must cease if the suspect asks for a lawyer  provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that might be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong. We therefore hold that, after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.
Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. That was the procedure followed by the NIS agents in this case. Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.
To recapitulate: We held in Miranda that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in Edwards that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect might want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.
Davis v. United States, 512 U.S. 452, 461-62, 114 S.Ct. 2350, 1356-57, 129 L.Ed.2d 362 (1994). Although the Davis opinion refers to the right to counsel, "every circuit that has directly addressed the issue `has concluded that Davis applies to both components of Miranda: the right to counsel and the right to remain silent.' Bui v. DiPaolo, 170 F.3d 232, 239 (1st Cir. 1999) (collecting cases)." James v. Marshall, 322 F.3d at 108. This Court has adopted Davis within the context of a right to counsel case. In adopting Davis in the right to counsel context, this Court cited to cases that applied Davis to right to remain silent cases:
We adopt the rule espoused by Davis and Zamora. In doing so, we have consulted with the views of our brethren in many jurisdictions and find them to be in agreement with the rule as well. State v. Simmons, 2000 MT 329 ¶¶ 19-24, 303 Mont. 60, ¶¶ 19-24, 15 P.3d 408, ¶¶ 19-24 (2000) (although defendant at first indicated he wanted an attorney, he then said, "I do not want an attorney present just for this part, no"and answered questions asked of him); Harte v. State, 13 P.3d 420, 428-29 (Nev. 2000) (During the course of his interview, Harte said, "Just out of curiosity, when do I get to talk to a lawyer?"; "I .... they .... they told me, you know, that they thought I should talk to a lawyer whatever"; "I don't wanna be a bitch and say, you know, give my [sic ] lawyer. But I mean;" and, "What do you think a lawyer would tell me right now?"; however, in full context of interview and clarity of Miranda warnings given, those statements were ambiguous); People v. Tally, 7 P.3d 172, 179-81 (Colo. App. 1999) (Although the defendant asked many questions about his right to counsel, he ended up saying, "Yeah, I'll talk to you."); State v. Whipple, 134 Idaho 498, 5 P.3d 478, 482 (Idaho App. 2000) (adopting Davis rule, but in context of right to remain silent where defendant repeatedly said, "No more!" to questions being put to him); Stemple v. State, 2000 OK CR 4 ¶¶ 9-10, 994 P.2d 61, ¶¶ 9-10 (Okla. 2000) ("I feel as though I should have an attorney," was equivocal response); State v. Kiriluk, 1999 UT App 30 ¶¶ 7-8, 975 P.2d 469,¶¶ 7-8 (Utah App. 1999), (defendant's response of "I don't," when asked if he had anything to say about evidence found in his apartment not unambiguous request for counsel or to remain silent); State v. Donesay, 265 Kan. 60, 959 P.2d 862, 871 (1998) (adopting rule in context of right to remain silent); Braboy v. State, 130 Md.App. 220, 745 A.2d 471, 477-79 (2000) ("I want a lawyer but I can't afford a lawyer," not an unambiguous exercise of right to counsel where defendant decided to talk after he was informed that a lawyer would be appointed for him if he could not afford one); Goodner v. State, 714 N.E.2d 638, 641 (Ind. 1999) (Goodner equivocated about whether or not he should talk without a lawyer, but ultimately signed written waiver and talked); State v. Brown, 589 N.W.2d 69, 72-74 (Iowa App. 1998) [overruled on other grounds, State v. Reeves, 636 N.W.2d 22 (Iowa 2001)] (defendant's statement, "Is my lawyer here?" not an unambiguous request for counsel); State v. Greybull, 1998 ND 102 ¶¶ 8-9, 14-21, 579 N.W.2d 161, ¶¶ 8-9, 14-21 (N.D. 1998) (defendant's statements, "You can't make me say nothing," "Do I have to get a lawyer?" and" Do I need to get a lawyer?" ambiguous under Davis); Cothren v. State, 705 So.2d 849, 851-55 (Ala. Crim. App.1997) ("I think I want to talk to an attorney before I answer that," ambiguous under circumstances of case); but see Billups v. State, 135 Md.App. 345, 762 A.2d 609, 614-16 (2000) (defendant signed signature line on form which purported to waive his rights to remain silent and have counsel, but wrote "NO" by his signature construed to be unequivocal exercise of right to remain silent and have an attorney).
The list of cases cited above is by no means exhaustive, and we concede that there are cases to the contrary. See, e.g., State v. Jones, 102 Wash.App. 89, 6 P.3d 58, 61-62 (2000) (Washington declined to adopt Davis rule); and State v. Rogan, 91 Hawaii 405, 984 P.2d 1231, 1249 (Hawaii 1999) (according broader rights under Hawaii Constitution). However, we find the Davis decision and its progeny convincing, and we adopt that rule for Wyoming.
Hadden v. State, 2002 WY 41, ¶¶25-26, 42 P.3d 495, ¶¶25-26 (Wyo. 2002) (emphasis added). As stated above, however, Hadden was a right to counsel case. The random citations to right to silence cases within Hadden are not intended to imply that the Hadden court adopted the Davis standard for right to silence cases. In Hadden, this Court was not directly presented with the issue of whether we should adopt the Davis standard in a right to silence case and no ruling thereon was made.
[¶15] Applying Davis to right to silence cases has been criticized. The ultimate holding by the United States Supreme Court in Davis was that "we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect might want a lawyer. Unless the suspect actually requests an attorney, questioning may continue." Davis, 512 U.S. at 462, 114 S.Ct. at 2357. This holding leaves the door wide open for law enforcement until an accused affirmatively and unequivocally invokes his right to counsel. It has been argued that the same latitude should not be granted to law enforcement in the right to silence context.
[¶16] From a policy perspective, the procedural safeguards attendant to the invocation of the right to counsel are different from the procedural safeguards attendant to the invocation of the right to remain silent. Once the right to counsel is invoked, all law enforcement questioning must cease until an attorney is procured for the suspect or the suspect initiates conversation with law enforcement. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) ("an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police").
[¶17] An invocation of the right to silence, however, must be scrupulously honored, generally meaning that questioning must cease, but can be resumed under appropriate circumstances. The United States Supreme Court defined the procedural safeguards attendant to the right to silence in Michigan v. Mosley:
A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . ." 384 U.S., at 479, 86 S.Ct. at 1630. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." Id., at 474, 86 S.Ct. at 1627. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his "right to cut off questioning" was "scrupulously honored."
Mosley, 423 U.S. at 103-04, 96 S.Ct. at 326 (footnote omitted).
[¶18] Because the procedural consequences for law enforcement are not as severe in a right to silence case, it has been suggested that an ambiguous affirmative invocation of the right to silence by a suspect should require the cessation of all law enforcement questioning except for questions intended to clarify whether the accused really intends to affirmatively invoke his right to silence.
Even if the defendant's assertion is susceptible to more than one interpretation, the limit of permissible continuing interrogation immediately after the assertion would be for the sole purpose of ascertaining whether the defendant intended to invoke his right to silence, cf. State v. Hicks, 133 Ariz. 64, 74, 649 P.2d 267, 277 (1982), or to waive this right. This limited additional questioning for clarification is consistent with the United States Supreme Court's mandate that the person in custody's "right to cut off questioning" must be "scrupulously honored." See Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975).
State v. Finehout, 665 P.2d 570, 573 (Ariz. 1983). See generally Wayne D. Holly, Ambiguous Invocations of the Right to Remain Silent: A Post-Davis Analysis and Proposal, 29 Seton Hall L. Rev. 558 (1998).
[¶19] In the case sub judice, the State argues that this Court should apply Davis. Pena only argues that his invocation was not ambiguous. Under the facts of this case, however, we do not have to decide the question of whether to apply Davis wholesale. At the very least, clarification of an ambiguous affirmative invocation of the right to silence is permissible and good police practice. The law enforcement officers conducting the interview of Pena did not ask any questions regarding the murder investigation until they had clarified whether Pena was willing to talk to them. The officers repeatedly informed Pena that he did not have to talk to them. Once Pena understood that the officers were not asking for a statement from him but instead simply wanted to ask him questions, his response was "I'd be glad to answer." Only then did the officers begin to question Pena regarding the murders. This interview procedure was permissible under any standard. We leave for another day a definitive determination of the scope of questioning law enforcement can engage in upon a suspect's ambiguous affirmative invocation of the right to remain silent.
[¶20] The final argument presented by Pena on this issue is whether Pena's statements were voluntary.
The voluntariness of an accused's statements is determined by examining the totality of the circumstances surrounding the interrogation. Witt [v. State], 892 P.2d [132] at 139 [(Wyo. 1995)]. Statements are voluntary if they are "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. (citing Vigil v. State, 859 P.2d 659, 664 (Wyo. 1993), which quotes Frias v. State, 722 P.2d 135, 142 (Wyo. 1986)). "[S]tatements [made] by the police to the effect that it would probably go easier for the accused if [he] cooperated have been declared innocent and constitutionally acceptable." Witt, 892 P.2d at 139. "Emotionalism, confusion, and subjective perception do not necessarily invalidate a statement or confession." Vena v. State, 941 P.2d 33, 37 (Wyo. 1997). The burden rests with the State to prove, by a preponderance of the evidence, the voluntariness of the accused's statements. Dodge v. State, 562 P.2d 303, 308 (Wyo. 1977).
Simmers v. State, 943 P.2d 1189, 1195 (Wyo. 1997). "[C]oercive police activity is a necessary predicate to the finding that a confession is not `voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986).
[¶21] Pena argues that the district court judge did not adequately consider the totality of the circumstances in determining whether Pena's statements were voluntary. Pena's argument that his statements were not voluntary, however, is based upon factors already discussed: Pena's assertion that he didn't understand his rights and the officers continuing the interview despite Pena's affirmative invocation of his right to remain silent. Pena also adds that the officers indicated that they would not leave until Pena gave them a statement.
[¶22] The decision letter of the district court quoted earlier reveals that the district court did evaluate the question of voluntariness in light of the totality of the circumstances. The district court affirmatively determined that the officers did not engage in any coercive tactics during the interview. The district court further determined that, based upon his answers and the inflection and intonation of his voice, Pena was cooperative. We have already discussed the language issue. The officers' repeated statements to Pena that he did not have to talk to them ensured that there was no misunderstanding based upon a language barrier. From our de novo review of the interview and the circumstances surrounding the interview we find that the State did bear its burden of proving by a preponderance of the evidence that Pena's statement was voluntary.

II. Motion to suppress search of mobile home
[¶23] After Stephanie ran from Pena's home to her aunt's home, she phoned 911 and talked to dispatch. She informed dispatch that her father had shot two people and that, as far as she knew, he had left the area. Stephanie mentioned that the gun involved was a shotgun. Sheriff's Deputy Doyle was the first officer to respond to the scene. He entered Pena's mobile home and did a brief inspection to assure that there was no one in the home, especially anyone possibly needing medical attention. Doyle noted that both victims were dead and that no one else was in the home. Doyle then retreated outside and requested dispatch to send an investigator.
[¶24] When Investigator Thompson arrived at the scene approximately twenty minutes later, Thompson entered the home to briefly inspect the scene. He noted rifle caliber shell casings on the floor and the two dead bodies. Thompson then retreated outside. Doyle stayed by the front door during Thompson's entry. Sometime later that evening three members of the Park County Prosecuting Attorney's office arrived and each member was individually escorted briefly through the home by Thompson. The home was then secured, and a search warrant was obtained.

Standard of Review
[¶25] We generally do not disturb evidentiary rulings made by a trial court unless the trial court abused its discretion. Wilson v. State, 874 P.2d 215, 218 (Wyo. 1994). In reviewing a trial court's ruling on a motion to suppress evidence, we do not interfere with the trial court's findings of fact unless the findings are clearly erroneous. Gehnert v. State, 956 P.2d 359, 361 (Wyo. 1998). We view the evidence in the light most favorable to the trial court's determination because the trial court has an opportunity at the evidentiary hearing to assess "the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions." Id. The constitutionality of a particular search or seizure is, however, a question of law that we review de novo. Id.; Hughes v. State, 2003 WY 35, ¶10, 65 P.3d 378, ¶10 (Wyo. 2003); Jones v. State, 902 P.2d 686, 690 (Wyo. 1995).

Discussion
[¶26] In his second issue, Pena argues that an unreasonable search, in violation of the state and federal constitutions, occurred when Deputy Doyle initially entered his mobile home, and occurred again when Deputy Doyle reentered with an investigator and later with three prosecuting attorneys without a search warrant. None of the warrantless entries lasted more than a few minutes. Pena's motion to suppress evidence discovered in the home because of the first two warrantless searches was considered at a hearing. Pena did not challenge the third entry, acknowledging that it was too brief to matter.[3]
[¶27] Pena argued that no exceptions applied to allow the warrantless searches and observations made by the investigators were included in the affidavit prepared to obtain a search warrant and thus all evidence seized from the mobile home should have been suppressed. In its decision letter, the district court stated that Deputy Doyle's initial intrusion to pursue an armed suspect and to ascertain whether injured persons or the suspect was in the trailer met several exceptions allowing warrantless entry. The district court determined that the second warrantless intrusion by the investigator was justified under an exception permitting a trained investigator to scan for weapons to protect the safety of those officers who were nearby securing the crime scene and to assess the crime scene to prevent the imminent destruction of evidence. The motion to suppress was denied.
[¶28] Pena contends that there is neither a trained investigator nor a crime scene exception to the warrant requirement as decided in Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), and Flippo v. West Virginia, 528 U.S. 11, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999). The State contends that these exceptions were approved in Ortega v. State, 669 P.2d 935, 940-41 (Wyo. 1983), overruled on other grounds, Jones v. State, 902 P.2d 686 (Wyo. 1995). The State also claims that because the search warrant affidavit was based substantially upon information not connected with the warrantless entry, the evidence obtained by warrant was not subject to suppression. If error is found, the State contends that it was harmless beyond a reasonable doubt. Because we agree with the district court's determinations, we will affirm on the same grounds it found, namely, that the warrantless searches were justified under exceptions and were not unconstitutional.
[¶29] The United States Constitution and the Wyoming Constitution prohibit "unreasonable searches and seizures." U.S. Const. amend. IV; Wyo. Const. art. 1, § 4. We have stated that under both constitutions, warrantless searches and seizures are per se unreasonable unless they are justified by probable cause and established exceptions. Morris v. State, 908 P.2d 931, 935 (Wyo. 1995). In addition to the consent exception to the warrant requirement, these specific exigent circumstances exceptions include:
 search of an arrested suspect and the area within his control;
 search conducted while in pursuit of a fleeing suspect;
 search and/or seizure to prevent the imminent destruction of evidence;
 search and/or seizure of an automobile upon probable cause;
 search which results when an object is inadvertently in the plain view of police officers while they are where they have a right to be; and
 search which results from an entry into a dwelling in order to prevent loss of life or property.
Hughes, ¶11 (citing Andrews v. State, 2002 WY 28, ¶18, 40 P.3d 708, ¶18 (Wyo. 2002). The existence of exigent circumstances is dependent upon all of the facts or circumstances viewed in their entirety. Hughes, ¶13. When a proper objection or motion is made by a defendant, the State bears the burden of proving that one of these exceptions applies. Mickelson v. State, 906 P.2d 1020, 1022 (Wyo. 1995); Dickeson v. State, 843 P.2d 606, 610 (Wyo. 1992).
[¶30] The district court determined that the law enforcement entries into the home were justified under exigencies permitting a search to prevent loss of life where an armed suspect was at large and presented officer safety concerns, to ascertain whether any victims required medical attention, and to prevent the imminent destruction of evidence. Pena urges that all three entries were to assess the crime scene which both the Mincey and the Flippo decisions specifically prohibit and the greater protection provided under the state constitution does not permit finding any exigency existed in this case. In Mincey, the Supreme Court was asked to recognize an additional categorical exception to the warrant requirement, which would allow police to make warrantless searches of dwellings that had been the scene of a homicide. Following a shoot-out in which a police officer was killed in the defendant's apartment, a warrantless search was conducted over a four-day period of the premises. Various items were seized and used against the defendant at trial. The Court, however, disallowed the "murder scene exception." 437 U.S. at 395, 98 S.Ct. at 2415. In Flippo, the United States Supreme Court reaffirmed that there was no murder scene exception to the warrant requirement. Flippo, 528 U.S. at 14, 120 S.Ct. at 8. Nevertheless, Ortega determined that Mincey did not prohibit a warrantless entry of a home that was a crime scene if justified under a recognized exigency. Ortega, 669 P.2d at 941.
[¶31] In this case, exigencies are claimed to justify the warrantless entries of this crime scene and present recognized exceptions to the warrant requirement. The emergency assistance exception applies when police have a reasonable basis for believing that another's life or safety is in danger. In that case, they may search the area to render assistance, but not to search for evidence. Ortega, 669 P.2d at 941; People v. Allison, 86 P.3d 421, 426-27 (Colo. 2004) (probable cause not required for the emergency aid exception). To prevent loss of life or property, an officer may walk through a home to determine if anyone else is present when officers have a reasonable belief that the area harbors an individual posing a danger to those present. Further, in previous decisions, we have upheld warrantless searches to prevent the imminent destruction of evidence. Ortega, 669 P.2d at 940; Patterson v. State, 691 P.2d 253, 258 (Wyo. 1984).
[¶32] The record shows that the evidence supports finding that the warrantless entries by the law enforcement officers onto the crime scene were justified under these exceptions. Deputy Doyle testified that he did not know that anyone inside was deceased and entered to see if anyone needed medical attention. The deputy had a reasonable basis for believing emergency aid was required, and his initial entry was justified. Immediately after determining that no one inside the home was alive and the suspect was not inside, Deputy Doyle left the home because he was concerned that the killer might return to it and waited outside for other law enforcement to arrive.
[¶33] Deputy Doyle's search was limited to the emergency assistance exception. He only checked on the health and safety of persons in the home. Pena, however, was still at large and reportedly armed. Officer safety concerns, as well as evidence preservation, support the second entry by the more highly trained investigator. Investigator Thompson arrived and spent three to four minutes inside the home assessing the crime scene. He observed the presence and location of the two bodies and rifle shell casings. Stephanie had reported use of a shotgun. Because the shell casings were from a rifle, Deputy Doyle immediately advised other officers who were still looking for Pena that Pena was armed with a rifle, a longer-range weapon.
[¶34] The State contends that we have previously determined that reentries may be considered a continuing warrantless search justified by the situation's exigencies in accordance with the holding of Michigan v. Tyler, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); and Shaffer v. State, 640 P.2d 88, 91-96 (Wyo. 1982). We agree with the State that Tyler permits consideration of factors, such as proximity in time and the continued existence of the exigencies that justified the first entry, to determine whether one continuing search has occurred or separate searches have occurred by reentries. See Bilida v. McCleod, 211 F.3d 166, 171-72 (1st Cir. 2000); State v. Magnano, 528 A.2d 760, 765 (Conn. 1987) (citing to People v. Reynolds, 672 P.2d 529, 531 (Colo. 1983)); State v. Johnson, 413 A.2d 931, 934 (Me. 1980), aff'd, 434 A.2d 532 (Me. 1981); Smith v. State, 419 So.2d 563, 568-74 (Miss. 1982); State v. Jolley, 321 S.E.2d 883, 886-87 (N.C. 1984); State v. Anderson, 599 P.2d 1225, 1229-30 (Or. App. 1979), cert. denied, 446 U.S. 920 (1980); State v. Eacret, 595 P.2d 490, 492-93 (Or. App. 1979); La Fournier v. State, 280 N.W.2d 746, 750-51 (Wis. 1979).
[¶35] Generally, the issue presented in these cases was whether a warrantless reentry to seize evidence seen in plain view during the initial valid entry was constitutional. We do not have that issue before us since no seizure was made until after a warrant was secured. Consideration of the fact that the officers did not seize evidence as well as all the factors just discussed supports finding that law enforcement entered for the reasons stated and not to make an exploratory search. We conclude that law enforcement's warrantless entry was initially valid for all the reasons discussed by the district court and the reentries were a continuing search that remained justified by the continued existence of exigencies.

III. Sufficiency of the evidence
[¶36] Pena argues that the State did not present evidence sufficient to support a conviction for first degree murder with regard to the death of Yensena.[4] Specifically, Pena argues there was insufficient evidence of premeditation.

Standard of Review
[¶37] This Court has recently stated its standard of review specifically with regard to reviewing sufficiency of the evidence of first-degree murder:
To determine whether sufficient evidence of a crime exists, we examine all the evidence in the light most favorable to the State. Lovato v. State, 901 P.2d 1132, 1133 (Wyo. 1995). Our standard of review in first degree murder cases, with special attention to the distinction between first and second degree murder, is not whether the evidence is sufficient for us, but whether, when viewed favorably to the state, it was enough on which a jury could form a reasonable inference of guilt beyond a reasonable doubt. Id. In evaluating evidence of premeditation, we use the following analytical framework:
Evidence sufficient to sustain a finding of premeditation and deliberation "falls into three basic categories: (1) facts about * * * what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing  what may be characterized as `planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a `motive' to kill the victim, which inference of motive, together with facts of type (1) or (3) would * * * support an inference that the killing was the result of `a pre-existing reflection' and `careful thought and weighing of considerations' rather than `mere unconsidered or rash impulse hastily executed'; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a `preconceived design' to take the victim's life in a particular way for a `reason' which the jury can reasonably infer from facts of type (1) or (2)." Verdicts of first degree murder typically are sustained when there is evidence of all three types and otherwise require at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3).

Bouwkamp v. State, 833 P.2d 486, 494-95 (Wyo.1992) (citations and emphasis omitted).
Olsen v. State, 2003 WY 46, ¶86, 67 P.3d 536, ¶86 (Wyo. 2003).

Discussion
[¶38] Pena testified on his own behalf at trial. While admitting that he shot and killed Yensena, he claimed that he did not premeditate the killing. He claimed that his argument was with Manuel and that Manuel threatened him. Pena moved his rifle to keep anyone from using it and to keep everyone safe. Ultimately, Manuel came towards Pena threatening him and in his fear, he simply "lost it." He shot Manuel, then he turned around and saw his wife coming at him with something in her hand and he shot her.[5] He wasn't very clear about when or why he fired the rest of the shots.
[¶39] The foundation of Pena's argument for this issue is his testimony that at the time of the shootings he "lost it," and was thus incapable of clear reflection required for premeditation. This, of course, is contrary to our standard of review that we view the facts in the light most favorable to the State. The facts viewed most favorably to the State are that Pena and his wife were involved in a heated argument that lasted several hours. The brothers were never involved in the argument. Yensena, crying, walked out of the home, and Pena grabbed his rifle and loaded it. He then also walked out of the home yelling that he was going to kill her. Yensena, still crying, returned to the home, followed by Pena who was still carrying his rifle. Yensena told her two brothers to pack because they were going back to Mexico. Yensena went into the bathroom, followed by Pena, still carrying his rifle. The argument continued for approximately another half hour. Ultimately, Pena shot Yensena twice in the back, killing her.
[¶40] These facts support all three of the categories of evidence this Court evaluates when reviewing for sufficiency of evidence of premeditation. Planning activity is clear from the fact that Pena retrieved his rifle and loaded it. He then threatened to kill Yensena, but did not carry through with that threat immediately. He followed Yensena everywhere with the loaded rifle. The motive was simply that Pena was angry with Yensena and did not want her to leave. Finally, Pena shot Yensena twice in the back. It is a fair inference that Pena, after threatening to kill Yensena, and after thinking about it for a while, did kill Yensena by shooting her in the back as she was trying to leave.
[¶41] Disguised as part of his sufficiency of the evidence argument, Pena argues that the jury instructions did not adequately advise the jury of the definition of premeditation. Here, Pena's argument leaves the domain of evidence and enters the domain of substantive law. Pena argues that the instructions as given could allow a jury to find a defendant guilty of first degree murder simply because the defendant had the intent to kill. Pena argues the instructions did not inform the jury that a person could have the intent to kill but still not be guilty of first degree murder because he did not have the required rational and reflective thought necessary for premeditation. If the jury instructions had adequately defined premeditation, Pena continues, then there is the possibility that the jury would have found that the State had not carried its burden of proving premeditation beyond a reasonable doubt.
[¶42] The jury instructions, however, were taken directly from the Wyoming Criminal Pattern Jury Instructions. Pena did not object to the jury instructions at trial. The jury was instructed "`premeditated malice' means that the defendant thought about and considered the idea of killing before the act which caused death was committed, and that the act which caused death was done with intent to kill and without legal justification or excuse." We are unsure from the argument presented in Pena's opening brief if Pena is ignoring the jury instruction requirement that the defendant "thought about and considered the idea of killing before the act" or if Pena simply concludes that the phrase "thought about and considered" is not sufficient to adequately inform the jury that something beyond mere intent to kill is a necessary prerequisite to a finding of first-degree murder. Pena only argues that the jury instructions failed to instruct the jury that it had to find something beyond the intent to kill to find first degree murder.
[¶43] In another sufficiency of the evidence case, Collins v. State, 589 P.2d 1283 (Wyo. 1979), this Court stated that:
The defendant's argument is better designed for jury consumption than an appellate court's. A failure on the part of the State to prove malice and premeditation are principally urged by defendant. Malice can be presumed from use of a firearm. Goodman v. State, Wyo.1977, 573 P.2d 400, 414. The word "premeditated" when used in reference to first-degree murder, implies an interval, however brief, between the formation of the intent or design and the commission of the act. State v. Riggle, 1956, 76 Wyo. 1, 298 P.2d 349, reh. den. 76 Wyo. 63, 300 P.2d 567, cert.den. 352 U.S. 981, 77 S.Ct. 384, 1 L.Ed.2d 366; Loy v. State, 1919, 26 Wyo. 381, 185 P. 796.
Collins, at 1292. The pattern jury instructions reflect the decision in Collins. This is still the law in Wyoming:
In Bouwkamp, 833 P.2d at 493, we reiterated the meaning of premeditation:
It [premeditation] is the "thinking over, deliberating upon, weighing in the mind beforehand, resulting in a deliberate intention to kill which constitutes the killing murder in the first degree." Parker v. State, 24 Wyo. 491, 502, 161 P. 552, 555 (1916). Premeditation may be inferred from the facts and circumstances. Murry v. State, 713 P.2d 202, 206 (Wyo. 1986); Goodman v. State, 573 P.2d 400, 407 (Wyo. 1977).
Persons convicted of premeditated murder often have questioned what amount of time is required in "thinking over" or "deliberating upon" for juries to find that sufficient premeditation existed. Our rule is:
Premeditation need not have existed for any given length of time before the act, it being sufficient that it existed at the time of the act; and the intent and the act may be as instantaneous as successive thoughts. Sandoval v. People, 117 Colo. 588, 192 P.2d 423 (1948).

Young v. State, 849 P.2d 754, 761 (Wyo. 1993) (quoting Murry v. State, 713 P.2d 202, 207 (Wyo. 1986)). See also Rude v. State, 851 P.2d 15, 17 (Wyo. 1993); Collins v. State, 589 P.2d 1283, 1292 (Wyo. 1979).
Hightower v. State, 901 P.2d 397, 403 (Wyo. 1995). We think the jury instruction adequately conveys the definition of premeditation under Wyoming law.
[¶44] Besides a suggestion that Wyoming should adopt California jury instructions, Pena presents no cogent argument and cites to no pertinent authority that we should change the law of premeditation in Wyoming.[6] The jury was adequately instructed on the meaning of the definition of premeditation as it currently exists under Wyoming law, and there was sufficient evidence to support a conviction of first degree murder.[7]

CONCLUSION
[¶45] The trial court was correct in not suppressing the statement Pena voluntarily gave to the Park County Sheriff's officers who interviewed him at the Limon, Colorado, Correctional Facility. Pena never unambiguously invoked his right to silence. The officers appropriately continued the interview to clarify whether Pena did want to invoke his right to remain silent. Upon clarification, Pena said he would be glad to answer questions and he voluntarily cooperated with the interview.
[¶46] The trial court was also correct in not suppressing the search of Pena's mobile home. The allegedly objectionable entries into the home were very limited and were all within certain exigent circumstance exceptions to the warrant requirement. The status of the victims was not known until Deputy Doyle's initial entry. Once it was clear that a double homicide had occurred, the status of Pena became very important for law enforcement safety. His location, whether or not he was armed, and what type of weapon he was armed with were crucial pieces of information that were immediately necessary to help insure the safety of officers that were searching for Pena. Investigator Thompson's entry facilitated the gathering of this critical information.
[¶47] Finally, there was sufficient evidence to support a finding of premeditated, first degree murder. Pena had been arguing with his wife for hours. He retrieved his rifle and loaded it. He threatened to kill his wife. He carried his gun with him as he followed Yensena for over half an hour. Yensena decided to leave and Pena shot her twice in the back. It is a reasonable inference from this evidence that Pena thought about and considered the idea of killing Yensena before he actually did kill her. The Judgment Upon Jury Verdict and Sentence is affirmed in all respects.
NOTES
[1] Pena argues in his brief that he actually said "no, not really" without suggesting that there was any controversy about what the actual statement was. Pena concludes his argument with "`no' means `no'" and all questioning should have ceased. This comes dangerously close to being interpreted as an affirmative attempt to mislead this Court. There actually was no controversy below as to what the statement was. The parties below stipulated to an accepted transcript of the audiotape. The stipulated transcription states Pena said "not, not really." The district court found, as a matter of fact, that Pena said "not, not really."
[2] The term "scrupulously honored" originally comes from Miranda v. Arizona, 384 U.S. at 478-79, 86 S.Ct. at 1630 ("Procedural safeguards must be employed to . . . assure that the exercise of the right [to remain silent] will be scrupulously honored.")
[3] On appeal, Pena contends that this Court's de novo standard of review permits our examination of all three warrantless searches. We decline this invitation. Pena conceded the issue below, and we will not review his tactical decision.
[4] Wyo. Stat. Ann. § 6-2-101(a), murder in the first degree, states:

(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest, kidnapping or abuse of a child under the age of sixteen (16) years, kills any human being is guilty of murder in the first degree.
[5] When Yensena's body was found she was gripping an empty, white envelope in her hand.
[6] Pena does present argument in his reply brief that Wyoming's law of premeditation is incorrect and should be clarified. In his reply brief he presents the argument in a direct attack of the jury instructions under the plain error standard. Pena did not frame a challenge to the jury instructions in his opening brief. A reply brief is not the place for an appellant to present new issues. It certainly is not the place to raise a new issue of constitutional magnitude. Even if this Court were to address the issue, there would be no need for this Court to make a definitive decision regarding the exact definition of premeditation. The evidence in this case supports any definition that the defense might argue. Pena retrieved his rifle and loaded it telling his wife he was going to kill her. He then carried the rifle around with him for at least a half hour as he continued a heated argument with his wife. It can reasonably be inferred that Pena had plenty of time to premeditate, deliberate or otherwise think about and consider killing his wife. The portion of the reply brief presenting argument on the definition of premeditation is stricken as being violative of W.R.A.P. 7.03.
[7] Pena also attempts to include prosecutorial misconduct within the context of his sufficiency of the evidence argument. Pena argues that the prosecutor, in his closing remarks, argued that the jury need only find intent to kill to find first degree murder. The comments were not objected to at trial. We decline to consider whether the comments were in error because, just as with the jury instructions, the comments have not been directly challenged on appeal under the requisite plain error standard.